**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE GORDON LAW GROUP, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 24-cv-2817 |
| | ) | |
| FPSG LLC, an Illinois Limited Liability Company | ) | |
| & JUSTIN MCCORMICK, an Illinois resident | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants | ) | |

**VERIFIED COMPLAINT**

Plaintiff, Gordon Law Group Ltd. ("Gordon Law"), by and through its attorneys, bring this action and allege the following against Justin McCormick ("McCormick") and FPSG LLC d/b/a/ Founder's CPA ("Founder's CPA") (McCormick and Founder's CPA collectively referred to as "Defendants"):

**NATURE OF ACTION**

1.     Plaintiff seeks damages, injunctive and other relief from Defendants for violations of the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq* ("ITSA"), the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq* ("DTSA"), breach of contract, and tortious interference with contractual relations.

2.     The ITSA and DTSA prohibit the misappropriation of confidential information and trade secrets of an employer by a former employee and/or competitor.

3.     Plaintiff Gordon Law is a law firm that practices in the relatively new field of cryptocurrency taxation.  Gordon Law has developed, over a number of years and at substantial expense, detailed and proprietary methods of calculating cryptocurrency taxes, particularly for use with taxpayers who are volume users/investors in cryptocurrencies.

4. McCormick, a former employee of Gordon Law, individually and as an agent of Founder's CPA, used and shared confidential information and trade secrets originally developed by Plaintiff in a manner that directly benefits himself and Founder's CPA, his current employer and a competitor of Plaintiff. Defendants' dissemination and use of Gordon Law's confidential information and trade secrets rises to the level of actionable misappropriation of trade secrets to which the ITSA and DTSA are designed to protect.

5. Plaintiff brings this Complaint seeking an order (i) declaring that Defendants' conduct violates the ITSA, DTSA and other state law provisions, (ii) requiring the Defendants cease the unlawful activities described herein, (iii) awarding Plaintiff damages in an amount equal to Plaintiff's actual damages and lost profits and/or the assessment of a reasonable royalty against Defendants, and (iv) an award for punitive damages, attorneys' fees and costs.

## PARTIES

6. Plaintiff, Gordon Law Group Ltd., is a law firm and is an Illinois corporation presently engaged in business in Illinois including within Cook County and this judicial district.

7. McCormick is a resident of Cook County, Illinois, within this judicial district, and is a former employee of Gordon Law and a current employee of co-Defendant, Founder's CPA.

8. Founder's CPA is an Illinois limited liability company, and the current employer of McCormick. Founder's CPA is a resident of this judicial district and provides services to residents of this judicial district.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States, as it is based upon violations of federal law, the DTSA, 18 U.S.C. § 1836, et seq. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims arising from the ITSA, and the common law claims of breach of

2

contract, and tortious interference with contract, because these claims share facts with the DTSA claims over which the Court has original jurisdiction, and the related claims form a part of the same case or controversy under Article III of the United States Constitution.

10.     This Court has personal jurisdiction over Defendants based upon Defendants' contacts with Illinois, the agreement at issue which is governed by Illinois law, and the acts committed by the Defendants within Illinois and causing injury within this state and judicial district, satisfying both Illinois' long-arm statute and due process.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Defendants are residents of this judicial district, and also because a substantial part of the activities giving rise to this litigation occurred in this judicial district..

## FACTS COMMON TO ALL COUNTS

### Plaintiff's Cryptocurrency Tax Reporting Practice

12.     Gordon Law Group Ltd., founded in 2012 by Andrew Gordon, CPA, Esq., has rapidly evolved into a prominent firm practicing in taxation and business law. Since 2014, the firm has distinguished itself in the burgeoning field of cryptocurrency taxation, addressing a significant service gap in the industry. Cryptocurrency traders, faced with the challenge of reporting their transactions for tax purposes without comprehensive reports from exchanges, find an indispensable resource in Gordon Law. The firm excels in compiling user transactions and generating detailed tax reports, a task analogous to creating 1099-B forms, which is both time-consuming and requires nuanced expertise.

13.     The firm's pioneering efforts in cryptocurrency taxation since 2014 have positioned it as an industry leader. Andrew Gordon's expertise in crypto tax and accounting has been recognized nationally, with his insights being quoted in esteemed publications such as the New

York Times, Bloomberg, CNBC, and The Washington Post. Gordon Law's collaboration with leading crypto tax software vendors and the development of proprietary methods to deliver services efficiently have further cemented its reputation. With over 30 employees, Gordon Law also boasts one of the largest client bases in the industry, underscoring its status as a key player in the field.

**Plaintiff's Trade Secrets and Confidential Information and Efforts to Maintain Secrecy**

14.     Gordon Law utilizes a unique, internally developed, procedure for completing its clients' cryptocurrency tax reports.  Over many years, and at great expense, Gordon Law has created and refined that procedure, and has developed templates and spreadsheets, including specific scripts and formulas, for: organizing and structuring client cryptocurrency holdings and related data in order to properly build a client "inventory"; pulling transaction data from online repositories in a unique manner and format; running the transaction data through its internally created "converters" to format the data for further processing; using Gordon Law's internally created formatting and formulas (called "tidbits") to organize the data and calculate and format pricing data; analyzing and reconciling the data for upload to other online software for tax calculation and; checking the reporting for errors and finalizing for inclusion with tax returns.

15.     Specifically, Gordon Law developed a process by which it collects information related to client cryptocurrency holdings and all associated cryptocurrency exchanges, wallets, and chains. It has further developed an inventory template to organize that information, along with a detailed process by which its employees refine the client data using online resources and then update, and organize the information on the inventory template.

16.     Thereafter, pursuant to Gordon Law's proprietary methods and procedures, transaction data related to the client's various holdings is obtained, formatted, and run through Gordon Law's internally created and proprietary "converters" for further processing and analysis.

The converters contain tabs for "input" (where the data is initially placed), and for "output" (where the data converted by Gordon Law's formulas and scripts is populated).

17.    Once the transaction data for each of the client's various crypto holdings has been converted, the data is exported to yet another internally created spreadsheet, called "All Transactions," it is further processed pursuant to Gordon Law's methodologies and formulas. Certain of these formulas, coined "Tidbits" by Gordon Law allow the transaction data to be calculated, grouped and formatted in a manner that is advantageous and efficient. With oftentimes tens of thousands (or more) of individual lines of transaction data, Gordon Law's Tidbits and other formulas, scripts, formatting and procedures, greatly streamlines the process and shortens the time required to prepare tax reports.

18.    From there, the transaction data is reviewed and reconciled through procedures created by Gordon Law, and additional analysis done so that information required for the tax reporting process is input and properly formatted for upload to a separate online tax calculation software, for generation of tax reports.

19.    Gordon Law's process is unique in that it does not use any one online software tool to complete the process of crypto tax reporting.  Rather, because of certain issues, limitations and inaccuracies identified by Gordon Law with the various online software tools, its unique process leverages the strengths of certain aspects only of each online tool.  Combined with its procedures and its templates and formulas, Gordon Law is able to prepare tax reports that are more accurate, provide greater tax advantages for its clients, and can do so in the most efficient and streamlined manner in this burgeoning industry.

20.    Gordon Law's internally created procedures, spreadsheets, templates, formulas and scripts contribute, both individually and as a combination/compilation, to Gordon Law's

competitive advantage over other crypto tax reporting services firms.

21.     All of Gordon Law's procedures, templates, formulas and scripts described above are contained on a private Google Drive.  The Google Drive contains certain folders for the various items.  The Google Drive is only accessible to employees of Gordon Law's Crypto Team with a need to utilize those documents and resources for crypto tax reporting purposes, and even then is only accessible pursuant to a two-factor authentication protocol. The Google Drive is not accessible to the public, to Gordon Law's clients, nor to Gordon Law employees who do not work on crypto tax reporting services.

22.     Additionally, because of the highly secret and sensitive nature of the information, Gordon Law requires employees working in its crypto tax services team to sign confidentiality agreements, protecting the use and disclosure of the information against use outside of Gordon Law.  Terminating employees are also required to sign a certification reaffirming their obligation to protect Confidential Information and trade secrets.

23.     Gordon Law's Employee Handbook also contains various provisions to protect the information, including polices covering "Intellectual Property & Confidentiality Policy"; "Safeguarding Property"; "Use of Firm Property"; "Visitors in the Workplace"; "Security"; and "Use of Electronic Communications and Computer Systems," all of which in some degree address the safeguarding of Gordon Law's proprietary methods and documents.  Employees are required to sign an acknowledgement of the Employee Handbook and its policies. (True and correct copies of relevant excerpts from the Employee Handbook are attached as **Exhibit A**; McCormick's signed acknowledgement is attached hereto as **Exhibit B**).

**McCormick's Employment with Plaintiff and Access to Plaintiff's Trade Secrets**

24.     McCormick was hired on or about December 6, 2021 by Gordon Law as an

associate in the crypto tax department. Beginning his career after law school at Gordon Law, with no prior knowledge of crypto taxation, McCormick was extensively trained in the firm's specific processes, procedures, spreadsheets, templates, scripts and formulas for preparing cryptocurrency tax reports for the firm's clients. As part of the crypto tax department, McCormick had access, through login and password, to Gordon Law's Google Drive containing the folders with all templates, documents, procedures, spreadsheets, formulas, scripts integral to the firm's crypto tax reporting preparation operations.

25.     Specifically, after ascending to a team leader role, McCormick helped to hone and refine the processes, procedures, and templates Gordon Law utilizes, as described above, in the preparation of crypto tax reports for firm clients.

26.     In fact, in McCormick's role as a team leader, he prepared training materials, including training documents and videos for internal use by those working under him, detailing Gordon Law's internally created methods for taking client raw cryptocurrency data, building an inventory, pulling the transaction data from exchanges and blockchains, using Gordon Law's templates, formulas and converters, tidbits, (including all the embedded formulas, scripts, and formatting) for purposes of creating crypto tax reports.

**McCormick's Contractual Obligations to Protect Plaintiff's Confidential Information and His Resignation from Employment with Plaintiff**

27.     As an employee of Plaintiff working on cryptocurrency tax reporting preparation, McCormick executed a Confidentiality and Intellectual Property Agreement on June 29, 2022 (the "Agreement") whereby McCormick agreed to maintain and protect the confidentiality of Plaintiff's Confidential Information.  A true and correct copy of the Agreement is attached hereto as **Exhibit C**.

28.     The Agreement defined the term Confidential Information to include "any

7

information, in any form or medium, concerning Company and Company client[s] and includes, but is not limited to, workpapers, templates for reconciling cryptocurrency transactions to generate tax reports, training videos, documents, manuals,… documentation on best practices, usage tips for software, and all information regarding the highly efficient process for crypto tax reporting that was developed by [Gordon Law]" (hereinafter "Confidential Information"). *See* Ex. C., p. 1

29.     Under the terms of the Agreement, McCormick agreed to not use or disclose Confidential Information for any purposes unrelated to fulfilling contractual obligations to Plaintiff both during and after McCormick's employment with Plaintiff. Specifically, the Agreement stated that "[i]t is the responsibility and obligation" of McCormick "at all times":

> to safeguard and hold in strict confidence all Confidential Information, and protect it against disclosure, misuse, espionage, loss, copying, reproduction and theft. [McCormick] may not and shall not copy, disclose or use, at any time, either during or after the term of employment, any Confidential Information for any reason, and whether or not for profit or other compensation of any kind, except solely to the extent that [McCormick] is required to disclose or use such Confidential Information in the proper performance of [his] assigned duties for Company. Within the Company, Confidential Information should only be shared with Company employees and contractors who have a need to know such information for the performance of their assigned duties.

Ex. C. pp. 1-2.

30.     On August 16, 2022, McCormick gave written notice to Gordon Law that he was voluntarily resigning his employment.

31.     On August 16, 2022, after McCormick tendered his resignation, Gordon Law presented McCormick with a "Certification" related to Plaintiff's Confidential Information and trade secrets.  McCormick signed the Certification that same day.  A true and correct copy of the Certification is attached hereto at **Exhibit D**.

32.     In the Certification, McCormick certified that he had returned, or would return to the Company within two days, all of the Plaintiff's Confidential Information, including all

originals and copies in any form. The Certification specifically included "processes, internal work papers, forms and documents relating to cryptocurrency tax reconciliation." Ex. D, ¶ 1.

33. Moreover, in the Certification, McCormick confirmed he had never "used or disclosed any Confidential Information, other than during the proper performance of [his] assigned duties for the [Plaintiff]." Ex. D, ¶ 2. McCormick also acknowledged that he would "at no time hereafter use or disclose any Confidential Information," subject to certain legal caveats. Ex. D, ¶ 3.

## McCormick's Employment by Founder's CPA and Their Disclosure and Use of Plaintiff's Confidential Information

34. Upon current information and belief, immediately or shortly after his resignation, McCormick commenced employment with Founder's CPA.

35. Currently, on information and belief, McCormick holds the position of Senior Associate in the Digital Asset Department at Founder's CPA, a firm that positions itself as providing "Modern Accounting Services". Founder's CPA, spotlighting FinTech, Blockchain/Cryptocurrency, and SaaS as their primary industries on their website, is a direct competitor of Gordon Law in the crypto taxation arena. They offer similar services, including generating tax reports and full tax returns for both individual and business clients in the cryptocurrency sector.

36. As part of McCormick's employment with Founder's CPA, he has created marketing and training materials on behalf of Founder's CPA ("Training Materials").

37. Beginning in March 2023, McCormick began publicly sharing a Google Drive folder including, without limitation, virtual replicas of Gordon Law's processes, templates, automated converters, folder structures, client forms, and other Confidential Information (the "Founder's Drive").

| Name | Last modified ▾ ↓ | File size | |
|---|---|---|---|
| 📁 Demo Account all - 2022 | May 5, 2023 Justin McCorm... | — | ⋮ |
| 📁 CTC Converters | Mar 21, 2023 Justin McCor... | — | ⋮ |
| 📁 Bitcoin.tax Template Folder | Mar 21, 2023 Justin McCor... | — | ⋮ |
| 📕 High level outline for the crypto reconciliation.pdf | Apr 2, 2023 Justin McCormi... | 996 KB | ⋮ |

38.     Many of these files were first uploaded by McCormick on October 11, 2022, less than two months after his departure from Gordon Law:

| Name | Last modified ▾ ↓ | File size | |
|---|---|---|---|
| 📁 4- Notes | Feb 21, 2023 Justin McCor... | — | ⋮ |
| 📁 3 - Work | Oct 11, 2022 Justin McCorm... | — | ⋮ |
| 📁 2 - Deliverables | Oct 11, 2022 Justin McCorm... | — | ⋮ |
| 📁 1 - Client Docs | Oct 11, 2022 Justin McCorm... | — | ⋮ |

39.     On May 6, 2023, Founder's CPA YouTube page (https://www.youtube.com/@founderscpa) published a video titled "Crypto Taxes Made Easy: Setting Up Your Inventory (Step #1)", narrated by McCormick.  This video included a link to the Founder's Drive, and details Gordon Law's specific internally-developed process of establishing a "client inventory" using the exact tools, templates and Confidential Information that Gordon Law created and utilizes.

40.     On May 15, 2023, Founder's CPA YouTube page published a 42-minute video titled "Crypto Taxes Made Easy: Pulling the Data (Step #2)", narrated by McCormick.  This video included a link to the Founder's Drive, discusses the exact two software tools used by Gordon Law in a unique way to "pull the data" and generate a usable data set, and further details Gordon Law's specific internally-developed processes, templates (including all formulas and scripts) and

10

Confidential Information for pulling and organizing the relevant data. Specifically in this video, McCormick details the use of specific Converters to create an "output" dataset from the raw data. The "converters" McCormick detailed in the video and included in the linked Founder's Drive, are virtual replicas of Gordon Law's converters, including the embedded formulas.

41. On May 23, 2023, Founder's CPA YouTube page published a video titled "Crypto Taxes Made Easy: Data Processing (Step #3)", narrated by McCormick.  This video included a link to the Founder's Drive, shares "essential knowledge and techniques to handle your crypto tax data like a pro" using replicas of Gordon Law's specific internally-developed processes, tools, templates and Confidential Information. The linked Founder's Drive included a "demo" All Transactions spreadsheet, which replicates Gordon Law's All Transaction spreadsheet, with its embedded formulas and scripts, including Gordon Law's "Tidbits" tab and formulas.  In the video, McCormick walks through Gordon's confidential procedures and how to use the functions of the spreadsheet, including the Tidbits functions.

42. On May 30, 2023, Founder's CPA YouTube page published a video titled "Crypto Taxes Made Easy: Reconciliation of Transfers (Step #4)", narrated by McCormick.  Reconciliation of transfers is a complex and critical step of preparing tax reports, to which Gordon Law has developed a unique process. While several software solutions exist, Gordon Law developed an excel-based solution.  The video posted by Founder's CPA and McCormick included a link to the Founder's Drive, sharing Gordon Law's specific internally-developed processes, tools, scripts, formulas, templates and Confidential Information.  In fact, the excel template and process shared by McCormick and Founders CPA in the video again duplicates Gordon Law's All Transactions template.

43. On August 3, 2023, Founder's CPA YouTube page published a video titled

"Crypto Taxes Made Easy: Updating Unmatched Transfers (Step #5) [Updated]" and a second video "Crypto Taxes Made Easy: Final Checks and Financials (Step #6) [Updated], both narrated by McCormick. These videos included a link to the Founder's Drive, and shares Gordon Law's specific internally-developed processes, tools, templates and Confidential Information used to update unmatched data transfers and for completing final checks of the reconciliation of converted data and financials.

44.     The Training Materials demonstrate that McCormick and Founder's CPA are fully utilizing Gordon Law's unique and secret methods and processes, and also show Defendants' use of the specific templates, scripts, and formulas created and refined by Gordon Law, including Gordon Law's proprietary methods for using certain software and tools in unique ways to generate cryptocurrency tax reports.

45.     McCormick has maintained in McCormick's possession Plaintiff's confidential spreadsheets, scripts, formulas, proprietary electronic documents, and other Confidential Information or otherwise recreated exact, or near exact, replicas of Plaintiff's documents, spreadsheets, scripts, formulas, and methods to the benefit of himself and Founder's CPA.

46.     On information and belief, Founder's CPA and McCormick have used and continue to use Gordon Law's trade secrets and Confidential Information to their benefit for the creation of cryptocurrency tax reports for Founder's CPA clients.

**Plaintiff's Notifications to Defendants and Defendants' Continued Use of Plaintiff's Confidential Information**

47.     Plaintiff provided McCormick with a letter detailing McCormick's breach of the Agreement and violation of the DTSA and ITSA on December 13, 2023, placing McCormick on notice of McCormick's breach of the Agreement and violation of DTSA and ITSA as well as the intention of Plaintiff to enforce its rights to the utmost extent of the law.

48.     Plaintiff provided Founder's CPA with a letter detailing Founder's CPA's tortious interference with Plaintiff's contractual relations as it relates to McCormick's obligations under the Agreement and its violations of the DTSA and ITSA on December 13, 2023, placing Founder's CPA on notice of its statutory and common law violations as well as the intention of Plaintiff to enforce its rights to the extent of the law.

49.     On information and belief, Founder's CPA has taken down the Training Materials from its YouTube page.

50.     Nonetheless, on information and belief, McCormick and Founder's CPA continue to use Gordon Law's Confidential Information in the preparation of cryptocurrency tax reports for its clients.  Based on McCormick's position with Founder's CPA, a position that is the same or similar to his previous position with Gordon Law, it is inevitable that Defendants will continue to utilize Plaintiff's Confidential Information and trade secrets and/or build upon Gordon Law's trade secrets to provide competitive cryptocurrency tax reporting services.

51.     Since sending the initial letters to Defendants, Plaintiff has engaged in continued efforts to have Defendants cease their use of Plaintiff's Confidential Information and trade secrets, including attempts to mediate this matter between all parties. Those attempts, however, have been unsuccessful, necessitating this action.  For its part, Founder's CPA has taken the position that the Confidential Information and trade secrets Gordon Law seeks to protect amounts to only "information derived from third-party, public, calculators and websites" and that McCormick's work for Founder's CPA is based solely on the training he received after joining Founder's CPA.

## COUNT I
## VIOLATION OF THE ILLINOIS TRADE SECRETS ACT
### (Against All Defendants)

52.     Plaintiff hereby incorporates and references the preceding paragraphs of the Verified Complaint as if fully set forth herein.

13

53.     In connection with its business, Plaintiff has developed and maintained, at considerable effort and expense, the Confidential Information related to its cryptocurrency tax preparation business that provides Plaintiff with a competitive edge. Plaintiff's Confidential Information includes, but is not limited to:

a)      Workpapers;

b)      Templates for reconciling cryptocurrency transactions to generate tax reports, including internally created formulas and scripts;

c)      Training videos;

d)      Documentation on best practices;

e)      Usage tips for software;

f)      Proprietary methods for using certain crypto tax software;

g)      Internally developed methods and procedures;

h)      Proprietary methods for extracting, compiling, organizing, sorting, and converting data from various cryptocurrency platforms, exchanges and blockchains; and

i)      Proprietary electronic documents including confidential spreadsheets with embedded formulas and scripts.

54.     The Confidential Information is essential to the success and continued success of Plaintiff. It represents the investment, at minimum, of millions of dollars in time and expense.

55.     Plaintiff has invested considerable time, effort, and expense in establishing and developing the Confidential Information. Each year, Plaintiff spends substantial sums of money maintaining, developing, and refining its Confidential Information.

56.     The Confidential Information gives Plaintiff a competitive advantage not enjoyed

14

by other entities or persons who do not possess the Confidential Information. It is not generally known outside Plaintiff, and access to items of Confidential Information is limited to select groups of individuals.

57. The Confidential Information would be extremely difficult to independently develop or create, if even possible at all. It could not be acquired from Plaintiff. Plaintiff has developed this information at considerable cost and expense over a period of years. It would require, at a minimum, many years, and considerable time and expense, to recreate even a portion of Plaintiff's Confidential Information through lawful means.

58. Plaintiff's success in this highly competitive business is dependent upon a number of factors, including the Confidential Information that Plaintiff has developed over the years through the expenditure of substantial time and resources.

59. The Confidential Information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use.

60. Plaintiff used, and continues to use, reasonable and diligent efforts to maintain and protect its Confidential Information, including (i) limiting access to certain databases and drives on its computer systems to only certain employees with a need to know or utilize the information, (ii) limiting access to its computer system on a password protected basis, (iii) limiting access to who can view what Confidential Information, (iv) having specific policies regarding the non-disclosure and protection of confidential business information, (v) requiring employees to sign acknowledgements of Plaintiff's policies governing the protection and non-disclosure of confidential information, and (vi) requiring employees who learn or have access to Confidential Information to maintain the confidentiality of such information through confidentiality agreements

15

and a re-certification of their confidentiality obligations upon termination of employment.

61. Plaintiff's Confidential Information constitutes trade secrets within the meaning of applicable law, including but not limited to within the meaning of ITSA.

62. Pursuant to his job duties with Plaintiff, McCormick had extensive access to Plaintiff's Confidential Information and trade secrets, as described above.

63. As of McCormick's termination from Plaintiff, McCormick took and/or maintained in his possession substantial amounts of Plaintiff's Confidential Information and trade secrets, including proprietary methods for compiling, sorting and converting data and using certain software and internally created spreadsheets, formulas ad scripts, and proprietary information on best practices for the preparation of cryptocurrency tax reports, all of which was developed by Plaintiff.

64. McCormick took and/or retained the Confidential Information and trade secrets without Plaintiff's consent or authorization, and in violation of Plaintiff's policies and McCormick's contractual obligations.

65. By taking, retaining, disclosing, and using for his and Founder's CPA's benefit Plaintiff's Confidential Information and trade secrets without Plaintiff's consent or authorization, and in violation of his duty to maintain the secrecy of the same, McCormick has misappropriated Plaintiff's Confidential Information and trade secrets.

66. After becoming aware that McCormick had retained Plaintiff's Confidential Information and trade secrets in violation of his duties to Plaintiff, Founder's CPA continues to use and disclose, and continues to allow McCormick to use and disclose, Plaintiff's Confidential Information and trade secrets. As an example, the Training Materials and the Founder's Drive fully demonstrate that Defendants disclosed and utilized, and are continuing to disclose and utilize

Plaintiff's Confidential Information and trade secrets in their competitive cryptocurrency tax reporting services. As such, Founder's CPA has also misappropriated Plaintiff's trade secrets.

67.     Founder's CPA did not engage in any activities to prevent the continued misappropriation of Plaintiff's Confidential Information and trade secrets.

68.     Without an injunction, McCormick and Founder's CPA will continue to use Plaintiff's misappropriated Confidential Information and trade secrets to divert business away from Plaintiff and otherwise unlawfully compete with Plaintiff unless prevented by this Court.

69.     Because McCormick's position with Founder's CPA is nearly identical to his position with Plaintiff, he and Founder's CPA inevitably will continue to misappropriate Plaintiff's trade secrets in their cryptocurrency tax reporting services business.

70.     Plaintiff has suffered, and will continue to suffer, harm from the misappropriation of its Confidential Information and trade secrets. The amount of damage it will incur from the misappropriation is difficult to ascertain and is irreparable.

71.     Founder's CPA and McCormick have directly benefitted and profited from their misappropriation of Plaintiff's Confidential Information and trade secrets.

72.     By reason of the foregoing, McCormick and Founder's CPA have wilfully and maliciously misappropriated Plaintiff's Confidential Information and trade secrets through improper means within the meaning of 765 ILCS 1065/2.

73.     ITSA allows for an award of damages for the actual loss caused by the misappropriation of the trade secrets and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss. Alternatively, ITSA allows for the award of a reasonable royalty for Defendants' misappropriation. 765 ILCS 1065/4(a).

74.     ITSA allows for an award of exemplary damages for willful and malicious misappropriation. 765 ILCS 1065/4(b).

75.     ITSA allows for an award of reasonable attorney's fees if willful and malicious misappropriation exists. 765 ILCS 1065/5.

76.     ITSA allows for injunctive relief to prevent any actual or threatened misappropriation of trade secrets. 765 ILCS 1065/3.

77.     The harm which Plaintiff will suffer if McCormick and Founder's CPA are not enjoined far outweighs any harm McCormick and Founder's CPA would suffer from the issuance of injunctive relief.

78.     As direct and proximate result of Defendants' misappropriation of trade secrets and Confidential Information described above, Plaintiff suffered and continues to suffer damages, including, but not limited to, lost business, lost revenues, lost profits, and damage to its good will, in an amount to be determined at trial. Plaintiff has also suffered and will continue to suffer immediate, irreparable harm warranting temporary, interlocutory, and permanent injunctive relief. Injunctive relief is necessary as Plaintiff is without an adequate remedy at law to prevent this harm to Plaintiff.

## COUNT II
## VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT
### (Against All Defendants)

79.     Plaintiff hereby incorporates and references the preceding paragraphs of the Complaint as if fully set forth herein.

80.     The actions of Defendants, as described above, constitute violations of one or more provisions of the DTSA.

81.     The DSTA applies because Plaintiff's trade secrets are related to products and services used in, and intended for use in interstate or foreign commerce, which are provided to

clients across the United States and globally.

82.     By engaging in the aforementioned conduct, Defendants misappropriated and inevitably will continue to misappropriate Plaintiff's trade secrets related to a product or service used in, or intended for use in, interstate of foreign commerce.

83.     In particular, the Confidential Information includes proprietary methods for generating cryptocurrency tax reports for clients across the United States.

84.     Plaintiff has taken reasonable measures to keep this information secret by, among other things: (i) requiring all employees who have access to Confidential Information to sign confidentiality agreements similar to the Agreement, (ii) promulgating confidentiality policies, (iii) limiting the disclosure and distribution of Confidential Information to a small number of employees, and (iv) requiring all departing employees to return all Confidential Information to Plaintiff upon conclusion of their employment with Plaintiff and to reverify their commitment to maintain confidentiality of the trade secrets.

85.     Plaintiff's trade secret information is sufficiently secret to derive independent economic value due to not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure and use, such as Plaintiff's competitors like Founder's CPA which obtained immense value from the disclosure and use of the Confidential Information.

86.     Without authorization, Defendants misappropriated and inevitably will continue to misappropriate these trade secrets and Confidential Information in a willful manner and with a deliberate intent to injure Plaintiff and improve Founder's CPA for their own financial gain.

87.     McCormick owes duties to Plaintiff to maintain the secrecy of the trade secrets and Confidential Information as well as limiting the use of the trade secrets.

88.     McCormick is an agent of Founder's CPA and is using, and inevitably will continue to use, Plaintiff's trade secrets in the course and scope of his employment with, and for the benefit of, Founder's CPA, with the knowledge, approval and ratification of Founder's CPA.

89.     Founder's CPA acquired the trade secrets and Confidential Information by improper means and is aware that its acquisition of the trade secrets and Confidential Information was done through improper means.

90.     Defendants can obtain economic value for the disclosure and use of Plaintiff's trade secrets and Confidential Information, for example, by avoiding years and millions of dollars in investment that it took Plaintiff to develop the trade secrets and Confidential Information.

91.     As a consequence of the foregoing, Plaintiff has suffered and will continue to suffer irreparable harm, injury, and loss. Pursuant to the DTSA, actual or threatened misappropriation of trade secrets can be enjoined. Unless enjoined, Defendants will continue to use Plaintiff's trade secrets and Confidential Information to unfairly compete, and Plaintiff will continue to suffer irreparable harm that cannot be remedied through monetary damages.

92.     As a direct and proximate result of Defendants' misappropriation of trade secrets and Confidential Information described above, Plaintiff suffered and continues to suffer damages, including, but not limited to, lost business, lost revenues, lost profits, and damage to its goodwill, in an amount to be determined at trial. Plaintiff has also suffered and will continue to suffer immediate, irreparable harm warranting temporary, interlocutory, and permanent injunctive relief. Injunctive relief is necessary as Plaintiff is without an adequate remedy at law to prevent this harm to Plaintiff.

## COUNT III
## BREACH OF CONTRACT
## (Against McCormick)

93.     Plaintiff hereby incorporates and references the preceding paragraphs of the

20

Complaint as if fully set forth herein.

94.     Plaintiff and McCormick entered into a valid and enforceable contract, the Agreement, attached as **Exhibit C**. Plaintiff performed all duties and obligations under the Agreement.

95.     As set forth above, McCormick breached the terms of the Agreement by taking, retaining, using and disclosing Plaintiff's Confidential Information and trade secrets for his own benefit and the benefit of Founder's CPA.

96.     Due to the overlap between his job at Plaintiff and his job at Founder's CPA, McCormick inevitably will continue to utilize and/or disclose Plaintiff's Confidential Information and trade secrets.

97.     Plaintiff has a substantial and legitimate interest in protecting its Confidential Information and trade secrets.

98.     As a result of McCormick's breach of the Agreement, Plaintiff suffered and continues to suffer damages, including, but not limited to, lost business, lost revenues, lost profits, costs of recovering its information, and damage to goodwill, in an amount to be determined at trial. Plaintiff has also suffered and will continue to suffer immediate, irreparable harm warranting temporary, interlocutory, and permanent injunctive relief. Injunctive relief is necessary as Plaintiff is without an adequate remedy at law to prevent this harm to Plaintiff.

99.     Pursuant to the Agreement and as warranted by governing law, Plaintiff is entitled to injunctive relief, as well as its costs and expenses, including without limitation attorneys' fees, incurred in bringing this action.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Founder's CPA)

100.     Plaintiff hereby incorporates and references the preceding paragraphs of the

Complaint as if fully set forth herein.

101.    As set forth above, Plaintiff and McCormick entered into the Agreement, a valid and enforceable contract. Plaintiff performed all duties and obligations under the Agreement.

102.    Plaintiff had a reasonable expectation that McCormick would fulfill his obligations under the Agreement.

103.    After Founder's CPA was aware of the existence of the Agreement between Plaintiff and McCormick, Founder's CPA induced and continues to induce, allow and ratify breaches of McCormick's obligations under the Agreement including by, without limitation, facilitating McCormick's disclosure of Confidential Information and his use of the Confidential Information in furtherance of McCormick's employment with Founder's CPA.

104.    Founder's CPA has no justification for its intentional and tortious conduct.

105.    As a direct and proximate result of Founder's CPA's actions by and through the subsequent breaches of the McCormick's contractual obligations described above, Plaintiff suffered and continues to suffer damages, including, but not limited to, lost business, lost revenues, lost profits, and damage to its goodwill, in an amount to be determined at trial. Plaintiff has also suffered and will continue to suffer immediate, irreparable harm warranting temporary, interlocutory, and permanent injunctive relief. Injunctive relief is necessary as Plaintiff is without an adequate remedy at law to prevent this harm to Plaintiff.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Gordon Law Group Ltd. prays for a judgment in its favor for all appropriate relief against Founder's CPA and McCormick, including:

A.    A preliminary and permanent injunction prohibiting Founder's CPA and McCormick and all those acting in concert with them from using or disclosing to any person any Confidential Information and trade secrets of Plaintiff; and

enjoining McCormick from continuing to breach the Agreement.

B.    A preliminary and permanent injunction barring McCormick from directly or indirectly being employed by Founder's CPA in a capacity similar to the capacity in which he worked for Plaintiff and/or in any capacity in which he will disclose or use Plaintiff's Confidential Information and trade secrets, specifically including that he may not work in any position related to Founder's CPA's provision of cryptocurrency tax reporting services.

C.    An award of Plaintiff's actual damages and lost profits for the misappropriation of Confidential Information and trade secrets, for punitive damages for Defendant's wilful violations, and for the amount Defendants have been unjustly enriched by such misappropriation; or, alternatively, for the imposition and award of a reasonable royalty.

D.    Founder's CPA and McCormick be ordered to immediately preserve and return to Plaintiff any Confidential Information and trade secrets of Plaintiff, and all copies thereof, in whatever form stored or maintained.

E.    An award of reasonable attorney's fees.

F.    Plaintiff be granted such other and further relief as the Court may deem just and proper, including, but not limited to, an equitable accounting for all profits lost by Plaintiff or reaped by Defendants, and accounting as to all persons to whom the Confidential Information and trade secrets, or any portion thereof, has been disclosed by Defendants.

The Plaintiff herein demands a jury trial on all issues so triable.

Dated:  April 8, 2024                                    Respectfully submitted,

                                                          **THE GORDAN LAW GROUP, LTD.,**

                                                          By: /s/ Jeffrey M. Glass
                                                                   One of Plaintiff's Attorneys


Jeffrey M. Glass (ARDC No.: 6206976)          Michael F. Hughes, (ARDC No.: 6279175)
AMUNDSEN DAVIS, LLC                           AMUNDSEN DAVIS, LLC
308 West State Street, Suite 320             3815 E. Main Street, Suite A-1
Rockford, IL 61101                           St. Charles, IL 60174
(815) 904-8804 - Telephone                   (630) 587-7922 - Telephone
(815) 987-9891 - Facsimile                   (630) 587-7960 – Facsimile
JGlass@amundendavislaw.com                   MHughes@amundendavislaw.com
**ATTORNEYS FOR PLAINTIFF**

## VERIFICATION

Under penalty of perjury, under 28 U.S.C. § 1746, the undersigned, Andrew B. Gordon, hereby verifies that he is the founder and Managing Partner of The Gordon Law Group Ltd., and is authorized to make this Verification on its behalf; that he has read the Verified Complaint and knows its contents; that the statements in the Verified Complaint are true and correct, except as to matters stated to be on information and belief, and as to such matters, he certifies that he believes them to be true.

_____
Andrew B. Gordon, on behalf of
The Gordon Law Group, Ltd.

Dated: April 8, 2024.