IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE GORDON LAW GROUP, LTD., Plaintiff, | ) | Docket No. 24 C 2817 |
| v. | ) | Chicago, Illinois |
| | ) | April 10, 2024 |
| FPSG LLC, et al., Defendants. | ) | 2:05 p.m. |

TRANSCRIPT OF PROCEEDINGS - HEARING
BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | AMUNDSEN DAVIS, LLC by<br>MR. MICHAEL F. HUGHES<br>3815 East Main Street, Suite A-1<br>St. Charles, IL 60174 |
| For the Defendant FPSG LLC: | QUARLES & BRADY LLP by<br>MR. STEVEN V. HUNTER<br>MR. MARK W. BINA<br>300 North LaSalle Street, Suite 4000<br>Chicago, IL 60654 |
| For the Defendant McCormick: | FISHER BROYLES, LLP by<br>MR. ROBERT MARK HALLIGAN<br>203 North LaSalle Street, Suite 2100<br>Chicago, IL 60601 |
| Court Reporter: | GAYLE A. McGUIGAN, CSR, RMR, CRR<br>Official Court Reporter<br>219 S. Dearborn Street, Room 2504<br>Chicago, IL 60604<br>312.435.6047<br>gayle_mcguigan@ilnd.uscourts.gov |

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(In open court.)

THE CLERK: 24 C 2817, The Gordon Law Group versus FPSG.

If you can state your name for the record. We'll start with plaintiff's counsel.

MR. HUGHES: Michael Hughes on behalf of plaintiff, The Gordon Law Group.

MR. HUNTER: Steven Hunter and Mark Bina on behalf of defendant FPSG, LLC, known as Founder's.

MR. HALLIGAN: Mark Halligan on behalf of Justin McCormick.

THE COURT: Good afternoon, everybody. Thank you for being here.

We're here for a hearing on the motion for a temporary restraining order and preliminary injunction.

Also if everyone would like to just have a seat, just in case it's a longer hearing, unless you would like to -- I mean, it's sort of up to you. Would you like to come up to the podiums or have a seat? Either way is fine.

MR. HUGHES: I'm comfortable here, your Honor.

THE COURT: Okay.

MR. HALLIGAN: Same here, your Honor.

THE COURT: Okay.

MR. HUNTER: I am as well.

THE COURT: Great.

So I, first of all, understand that you just attempted to settle, so I appreciate your efforts at least to try that and see if you could resolve it. But I understand it did not -- it didn't work out, so we should proceed with the motion.

Is that all fair?

MR. HUGHES: I think that's fair, your Honor.

MR. HUNTER: That's fair.

THE COURT: Okay. So I have the motion and I have the complaint, and so I -- just because it has been moving quickly -- I'm sorry, just bear with me one second. I just want to make sure I have the docket in front of me.

(Pause in proceedings.)

THE COURT: Okay. So -- and I have the docket in front of me. The complaint was filed April 8th, which is the day before yesterday. Then yesterday the TRO motion -- or I guess it's requesting both a TRO and a PI. Yesterday, that motion was filed. And I guess -- I mean, there's obviously supporting filings along with the motion for TRO, the memo, the affidavit. And the affidavit, there's a redacted version. There's also a sealed version, unredacted. So I have those materials.

But because it's been moving so quickly, I would -- it would be helpful just to hear, from the parties, arguments on the motions and also -- I guess maybe before we get into detail

on the substance of the motion, maybe let me just ask first, does that seem -- do you have any other suggestions as to how to proceed?

I mean, I think I just need to hear about the substance of the motion, but does anyone have any different kind of procedural process requests? Like, do you want to start with anything other than going directly to those arguments?

MR. HUGHES: The only other thing is we have -- we do have that motion for leave to file the redacted -- the documents under seal. We filed them provisionally as per Rule 26.2. I don't know if the Court has looked at that or if the defendants have any issue with those documents being filed under seal.

MR. HALLIGAN: So, your Honor, I'd like to address that procedurally, and I have several other procedural issues on behalf of my client, Justin McCormick, who is the former employee.

This matter dates back to at least December when I began discussions with Michael back and forth to resolve this. And from day one, I've said the starting point in a trade secrets case is, first, let's get a protective order in place so you can share the alleged trade secrets under a protective order so I can begin to evaluate whether or not, what I call the "it" analysis, whether or not those particular pieces of

information constitute trade secrets under the Uniform Trade Secrets Act or the Defend Trade Secrets Act. And we never could get any farther.

And the filings that came in yesterday, before my client was even served -- again, this goes back to December. The draft complaint that was filed yesterday is the draft complaint that had been under discussions back in December. So there is no emergency. This is not an emergency situation. And I was shocked when I saw all this come in yesterday afternoon. Actually, I didn't see it right away. People said it's in your email. It was one of these where you have to use a pass code to get in to download the documents. I was in the middle of another matter.

But at this point, I cannot defend my client. I don't have a clue what the alleged trade secrets are in this case. Everything is at a very high level. Just to give the Court an example, on the very first page, the very last sentence, "GLG, The Gordon" -- "GLG utilizes a unique" -- strike that. "The Gordon Law Group, GLG, utilizes a unique, internally developed procedure for completing its clients' cryptocurrency tax reports."

I don't have a clue how to prepare a defense to that.

And this is -- and this is what goes on all through the briefing. These -- and there's also this issue that inside information the plaintiff owns. They don't own any inside

information. They have to show the existence of information that's not generally known in the trade. They have to show they took reasonable measures to protect it. And in this district, we do a six-factor analysis to see whether or not the alleged trade secret qualifies as a statutory -- the alleged information has to qualify as a trade secret.

So we did make progress. I want the Court to be aware, we did make a lot of progress in our discussions, but we're not there yet.

But this is some -- this is just not an emergency situation that requires emergency relief. And I think if the parties work together -- I, again, renewed my request that you send the proposed protective order so I can review the evidence.

The other point is, your Honor, filing under seal, I mean, we don't even -- this case just was filed, and then there's a filed under seal? We can't see what was filed under seal. We're the parties that were sued.

And so I think the whole situation -- I think there really should be a cooling-off period, maybe, you know -- I don't know how many days. The client was just served a summons today, so the client has 21 days to answer. I expect there will be a counterclaim. I expect there will be affirmative defenses. I have to meet with the client. But we certainly don't have any situation here that would require an immediate

ruling by this Court.

And, again, the proposed injunction is as broad as I described before. A temporary, preliminary, and/or permanent injunction prohibiting McCormick from providing services to Founder's that are the same or substantially similar in nature to the services McCormick provided by Gordon Law. I mean, I have no idea what that means and how to defend against it. And then, C, a temporary, preliminary, and/or permanent injunction prohibiting McCormick from using Gordon Law's confidential information and trade secrets for his own benefit or the benefit of others.

Well, how can we agree to that? We don't know what the trade secrets are. There's been no adjudication of anything being a trade secret. And here the proposal is that he be restrained, again, prohibiting him from using Gordon Law's confidential information and trade secrets for his own benefit or the benefit of Founder's.

So, procedurally, your Honor, you know, I think the starting point is to identify with particularity -- the Court is well aware of how the case law is developing, about you can't come in with this general -- you have to be able to distinguish what's generally known in the trade, what's unique about -- or what's different from what's generally known in the trade. You have to identify the alleged trade secret with particularity so the defendant can prepare a defense. And at

this point in time, I cannot prepare a defense based on the disclosures here.

And just one final point, as the moniker "confidential information and trade secrets," I object. There is no such thing as confidential information. Either the information qualifies as a statutory trade secret under the Illinois Trade Secrets Act and the Defend Trade Secrets Act, or it doesn't qualify for any sort of protection. You can't sweep everything in confidential information and trade secrets because there isn't a broader realm of protection beyond trade secrets. And that's used throughout the brief.

I also want to point out to the Court that, you know, we all know that we have to -- we are not authorized to disclose or use the trade secrets of our former employer. That's prohibited. But we are able to use our general knowledge, skills, and experience as a former employee. And I think that's what we have here. That's completely left out of the briefing, that -- virtually everything that I've seen as of today is the former employee using his own general knowledge, skills, and experience, practicing his profession, working for this -- for the firm, for Founder's.

And to come in here and to try to restrain him from his livelihood, saying that you should be permanently enjoined from using our trade secrets and our inside information, I think is not well taken.

Those are my comments.

THE COURT: Okay.

MR. HUGHES: Your Honor, if I can just quickly address some of those things? And I'm happy to answer your questions.

But I thought -- I think Mr. Halligan got deeply into the merits as opposed to, I think, without -- your question to the parties was: Are there any procedural issues?

But, number two, certain things he said are just not true. And the -- all of the sealed exhibits have been sent to counsel for both parties, for both defendants. They have them, just like they were delivered to you. They were delivered by FedEx to their offices this morning, and they were delivered by email through email link yesterday with a cover email stating you're going to get another email from the file transfer site. And so they have access to them. They've been given access to them. To the extent that the trade secrets, as something is being hidden from either the Court or defendants in trying to get this TRO, we take exception to. There is -- they have all of that information. You know, whether or not they've looked at it is another story; but it's been given to them in two separate forms, both yesterday and today.

I don't know if your Honor wants me to get into his argument on the specificity of the trade secrets. I don't know if you want me to get into that at this point, or if you have something you want to follow through on.

THE COURT: I mean --

MR. HUGHES: Because there's very, very specific information here. There are examples of the exact formulas and scripts and things all attached here. And they're all, first off, described in the verified complaint with reliquit -- or with the requisite particularity. You used our formulas and -- to convert. You put the data through a converter that we created. Here's an example of it, attached hereto. Here's an example of yours; here's an example of ours.

They -- and for Mr. Halligan to suggest that he doesn't know what any of this issue is -- this is information that they published to YouTube, that Founder's and Mr. McCormick have published. And we said that information, the information your client published -- the formulas contained within the spreadsheets, the process that your client has described verbatim in a six-part, step-by-step guide on YouTube -- that's our information.

So the argument that it hasn't been stated with particularity is -- for him to grab one sentence off of page -- the first page of the brief, to say that doesn't do it, well, he's right. That one sentence doesn't. But the balance of the rest of the brief, the affidavit, and the exhibits clearly outline the specific technical and secret nature of the information.

Also, let's not lose sight of the fact that there's a

breach of contract claim here as well. That contract says -- and Mr. McCormick agreed to in the contract -- I will not use the processes, the formulas, the scripts, the procedures, for completing crypto tax currency reports once I leave here.

And so, yes, there is contractual protection over something that might not rise to the level of a trade secret here. We contend that all of it does. But the term "confidential information," as defined in the contract that his client signed and then signed a certification on his last day of work saying, "Yes, I agree, I certify my prior agreement not to disclose this thing," and what he did was he turned around, created step-by-step guides -- both in written form, which they also have -- a step-by-step process. How can they say we haven't described it in particularity? We've explained, it is the process and procedures as outlined by their own clients in a 20-something-page exhibit. If it was general knowhow, it wouldn't need to be in that white paper that matches our white papers, that matches our internal videos, training videos, that Justin McCormick prepared while he was working for us as well as other people, showing the exact same procedures, the exact same formulas, the exact same methods of use. That's all specifically explained in the verified complaint, in the affidavit of Mr. Gordon, as well as in the brief and the exhibits.

I don't know if their thought was, you know, your

Honor hadn't read something so they could just read a sentence off of the first page, but that's just not the case here.

THE COURT: Okay. I initially -- I was just trying to get up front, bring some structure to this, and I think now we've actually got into the merits.

So let me just find out, does anyone have any other arguments on the merits before -- okay.

MR. HUNTER: I do, yes.

THE COURT: You would like to. Okay. So let's just talk about how is this going to go?

MR. HUNTER: Yeah.

THE COURT: Because what I was trying to do up front was maybe set up a process where it would track the briefing. So -- I guess it's your motion, so I was going to ask you, the plaintiff, to speak first -- or you first, then have responses from the defense, then go back to the plaintiff for the equivalent of a reply. But we've gotten a little bit off track.

And so at this point, I mean, I guess I've sort of heard from -- we're just out of order. So why don't we go to -- I mean, do you have anything else you would like to -- the plaintiff would like to present?

MR. HUGHES: I mean, I guess I would be remiss, you know, to -- arguments on how we kept -- how we keep adequately secret this information. We require people to sign

confidentiality agreements who work with it. It's contained in a Google Drive that is only accessible to people in the department, with two-factor identification. It is the subject of several policies protecting the confidentiality of that information. It's been developed over many, many years, at great expense and training costs.

And so I don't know how deeply you want me to go into all of those other factors as to rising to the level of trade secret, but as your Honor can see -- you know, I can point to specific pages of the exhibits for examples of showing their clients using our same exact formulas on their demo spreadsheets to our template spreadsheets.

And I think the issue we got bogged down in, in trying to come to some agreed order here, is not the return, non-use of certain templates that they may have of ours or that were recreated using our formulas. But our argument, as described, is that our whole process, from the beginning process of doing an inventory, the method of putting together this inventory, how to go online and pull data from certain sources, which typically you would upload certain information there and let it run. So we're actually extrapolating data from certain places online in a very specific format, in a very specific way, to build an initial inventory, and then to reconcile that before we then run that through other converters that we've created internally so it can speak to other -- so we're -- it's not

just we want those templates back. It is they -- this is a procedure that is not known. It is not used. It is developed at great length and expense. I mean, it takes -- it took them six -- six videos that are each at least a half hour on YouTube to describe it. It's countless video hours of ours. And their own white paper, which is, like I said, it's Exhibit 7, it's over 20 pages long, the step-by-step instructions of how to use this.

And so I think the hang-up is they're not willing to say we're not going to use your procedure, what you described as your procedure. We'll return certain templates to you, and then we'll work with you on seeing what other information might be residing in our systems.

But we want -- we would want any injunction to say, no, it's not just one individual piece or one individual formula. It's the whole procedure, from the beginning to the end, that was developed internally, taught to Mr. McCormick. Mr. McCormick helped to develop it further while he was there. He touts that.

And, you know, to the -- in speaking to emergency, we just found -- they took the videos down off of YouTube. And they published all of their template documents, which included our formulas, along with that YouTube. They took that down when we were first talking. And we wanted to try and mediate this. That was rejected by defendants, mediation.

But now we find, just this week, that Mr. McCormick has published a new website, and they say they don't use our process anymore, that they've developed something else. Our position is we don't believe that just at face value, number one. To the extent they've used what we have and used the software program to automate even the things that we haven't automated yet, they used -- using our system in a differently automated way, we think that ought to be enjoined. They got a turn-key operation. But now just this week, even though their position is that they don't use our process in any way, shape, or form, they won't agree not to use our process as described in the papers, but also Mr. McCormick has a new website out, not -- it's not under the Founder's banner or the -- it's not under his current employer's banner, but it says here's the process. And it lists the same steps, in overarching terms, but is the same procedures that we taught him and we used and that relies on all this information. And it also lists his business address as Founder's business address.

And so that is -- that's our position. You're saying you don't use it, although you've got a new website up that's kind of over here, sidestepping Founder's, which describes it. Its got a timeline of how we developed it, which goes into detail about his work for us -- he doesn't name us -- but how he developed his system while working for his first crypto tax employer. And he's -- it's out there for people to -- to --

it's marketing it, the same system. Even though they're saying they don't use it anymore, they put up a new website with Justin McCormick, defendant, and their business address.

So as far as immediacy, it certainly is here. And the fact that our stuff is out there being used, and whether they say that we don't use it, I think the proof is in the pudding, and they won't -- they won't agree that they won't use the process. They've got a website up there that describes the process by Mr. McCormick and -- and using Founder's business address. That is why we have an immediate need for an injunction in this instance. And it is -- it is -- it just doesn't track with the arguments that have -- that defendants have made thus far.

And so even if the Court were to find certain of these things don't rise to the level of trade secrets, we think together they certainly do, and we think most of the individual steps themselves do and the formulas and the scripts and the templates and the order of operations that we've put together that are completely unique and developed, even if that -- that is -- that is defined in the agreement, the confidentiality agreement, as being protected, and it's something Mr. McCormick won't use for himself or another employer, and that's clearly what is happening and what he's doing. And that's why we need the injunction to go more than "We will turn over your templates to you."

THE COURT: Okay. So I -- one question I have is -- I mean, if that's the key area of dispute, does what's happening -- you know, the use of the process -- does the entire process rise to the level of a trade secret or not, then that sounds like something that maybe either doesn't need discovery or could even be resolved by holding -- you know, have Mr. McCormick have someone from Gordon Law come in tomorrow and we just hold a hearing. They walk us through the process. They walk us through -- so it's sort of like what the affidavit says already. But because it's technical, I could benefit, maybe, from just like hearing live from someone showing me, okay, this is what we mean by the process. It looks technical from the affidavit and the attachments in Exhibit 7, which has many, many steps. But, you know, to read that is a different thing from seeing someone talk through it.

So rather than -- sometimes in this sort of situation where someone leaves and tries to start a competing business or join a competing business, there are things that require discovery, like when did you download this document, when did you -- you know, did you bring it with you, what -- you know, you have to do some discovery into who had what info when and gave it to who when. And so if there's stuff like that that needs discovery, then that's a route that we could go down; but if it's more of an issue of is this or is this not a protectable trade secret, then that sounds like maybe not so

discovery-intensive. We just need to hear from them, and then I can know within, like, a day.

So I -- I mean, why don't I -- any further comments on that question? You know, what -- does it need discovery? Does it not?

MR. HUGHES: Well, frankly, I don't know what the defendants' position is on whether or not -- initially, they've -- the initial paper or conversations in December were, no, the only thing that's -- this is all just online calculators. This is not protected anyway. And that's not -- it's just not the -- I don't know if that's still their position. I don't know if, after seeing the sealed documents that they have where they can see the exact formulas were taken or used by Mr. McCormick and Founder's, if -- I don't know if they're going to concede that, yes, that came from you, or if they're going to say, oh, we -- he just came up with it, or that's the way anybody would code it. So I don't know if -- what their argument is going to be, if we need discovery to somehow show that other than, you know, this document went from a Founder's drive to Mr. McCormick to -- excuse me, Gordon Law drive to Mr. McCormick to Founder's. I don't see there's any way that they can't take the -- that they would -- could take the position this was all just his own creation after leaving.

And so if their position is only that this is -- this is general knowhow, then I think what your Honor is suggesting

is a hearing on, okay, what is this stuff and how does it work, but I don't -- I wouldn't forego other discovery if their position is going to be you haven't shown that it came -- that it originated there.

THE COURT: Okay. So why don't I just pause now and ask for a response from first Founder's, then any additional response from Mr. McCormick. Then we'll do a reply from Gordon.

MR. HUNTER: So just to calibrate, we also don't agree that most of the information that they're claiming is actually a trade secret. We have agreed, though, in the interim, to address your Honor's kind of procedural issue, that we would return everything that was shared online, that we would agree for the Court to enter an order saying that we can't use any of the information that was shared online, and that we will work with them about securing additional information, without conceding that these -- any of this information is a trade secret, and that we would not use any of that information moving forward.

The issue in the case is that -- and the reason that we weren't able to reach an agreement is that the steps associated with calculating crypto tax exposure are commonly known by the practitioners in the space. In order to calculate crypto tax exposure, you do have to select all the crypto information. You have to create kind of a list of all -- where

these transactions took place and refine and format that data, and then synthesize it in a format that can be used by these online publicly available kind of calculators. They want us to agree that we won't engage in any of those steps.

We are five days before tax day, which I imagine is why this was filed as an emergency, and I represent a tax preparation company. And they have -- they are requesting that we no longer engage in trying to calculate crypto tax by this formula or by this method, which is the only method to actually accomplish this for our clients that are currently expecting us to finish their taxes.

They have also asked that we no longer employ the person who we hired in order to calculate these kind of crypto tax exposure calculations.

And so our position is that, look, we have -- we are willing to have the Court hold these things. We are willing to have the Court order that we are not allowed to use any of this material that they claim is a trade secret, which we dispute, while we are -- while this case is pending.

But the only things that we can't agree to is that going through a process in order to compile and calculate these things is not a trade secret, and we can't agree that we won't do that for our clients who are currently waiting for us to complete their taxes.

With respect to -- I mean, we can make argument with

respect to likelihood on the merits. Obviously, there are two claims against my client, the first being a trade secret and our -- we've just submitted that we don't believe that any of these things are trade secrets.

But on the second point, there's a tortious interference claim against us, and we don't believe that can succeed because there's no evidence that we were aware of this confidential arrangement between the parties. And they don't allege that as part of the complaint. In fact, what the complaint does say is that as soon as this was brought to our attention, which is in December of 2023, we removed all of that information from our YouTube channel. We don't use that information currently. And we are willing to have the Court enter that kind of order, that we are not going to use any of the templates or any of the things that they identify as their issues. But actually the steps necessary to calculate someone's crypto tax exposure is something that we can't agree not to do when we have the responsibility to calculate that on behalf of clients that are sitting on our desk right now and expecting these to be completed within the next few days.

THE COURT: Okay.

MR. BINA: I'm sorry. I'm co-counsel with Mr. Hunter. If I can just make one quick item as well, just in addition to that. And this really goes to the timing and the notion that this is brought up as a TRO. As the Court is well aware, the

standard for that is quite high. And the idea that this would potentially last ten days, I -- as my colleague noted, the timing here is very questionable. I learned earlier today that there was a draft complaint shared with our colleagues back in December of '23, which, to me, brings about a major laches problem. What is the emergency? Why is today so important? Why wasn't this filed a month ago or two months ago? And I think, as my colleague noted, I think the timing is suspect here.

But, ultimately, your Honor, the point I wanted to make has to go to whether a TRO ought to issue. And as the Court is well aware, under Rule 65, a bond is necessary. If a TRO is to enter, a bond is necessary to protect the defendants against damages that are caused by a TRO. In this scenario, as my colleague pointed out, I would submit the damages could be extreme. Here we are, five days before the tax season. If the order proposed by plaintiff were to be entered, we're going to have hundreds, if not thousands, of clients who will not have their taxes filed on time, who will suffer late penalties, assessments, claims, IRS issues, notwithstanding I'm sure civil claims wondering why this didn't happen.

So, your Honor, I would suggest, at a minimum, Mr. Gordon post a $10 million bond to secure against any damages our client might suffer here.

So, again, I would suggest a TRO is not appropriate,

at all, for the reasons Mr. Hunter stated. There is no emergency today. This case could have been filed a long time ago, but -- the timing is very questionable. But, again, all the more reason why we don't think a TRO is appropriate.

I just wanted to add that extra position as to the bond.

MR. HALLIGAN: Your Honor, there will have to be experts and discovery on the issue of whether a particular piece of information or particular protocol or particular procedure qualifies as a trade secret. That is, it's information that was not generally known in the trade and at all times we took reasonable measures to protect it.

Again, I don't know what the scope of the alleged trade secrets -- is it 10 trade secrets, 20 trade secrets? But before I can prepare a defense, I have to know exactly, with particularity, what is alleged to be the trade secret so I can go through the six-factor analysis.

Was it generally known in the trade? To what extent was it known outside the company? To what extent was it known inside the company? How much time after the money was expended to develop it? What is the value of it? What is the level of security used to protect it? And what's the difficulty in reverse engineering it? And I have to do that for each alleged trade secret. Right now, I cannot at the level of the description of their technology.

What I see is a plaintiff that thinks anything that occurred within their -- on their premises or in their bailiwick, they own.

There's been no consideration, as I said before, in general knowledge, skills, and experience that actually my client owns or may own.

But, again, having been served with the summons and now with 21 days to respond -- as I've advised the Court, we will, within the 21 days, file an answer and probably counterclaims and a number of affirmative defenses if we're not able to resolve this. And we will demand a trial by jury on questions of fact that in a trade secrets case, what constitutes a trade secret question of fact, what constitutes misappropriation of that trade secret, is a question of fact.

And so I don't think that we can resolve this by having a non -- some sort of special evidentiary hearing at this point.

But I do think that the parties should -- you know, we can continue to discuss how we can frame an agreed order, because at the current state of the pleadings -- and, you know, even on the affidavit, all the affidavit does is refer you back to the paragraph in the complaint. The paragraph in the complaint was already overbroad. So, you know, linking it into the affidavit by going back to the complaint doesn't seem to make a lot of sense.

What does make sense is for us to get a proposed protective order in place so that the plaintiff can provide the alleged trade secrets to me under the protective order so that we can evaluate it. And to the extent we need experts, we can have experts look at it.

But this is just not ripe for any sort of emergency order, which, again, under these circumstances, I think is not warranted.

THE COURT: Okay. Any reply from --

MR. HUGHES: Yes, please. I'll just kind of go in reverse order.

What Mr. Halligan is suggesting is just not true, that the -- all the affidavit does is point back to the complaint. That's just untrue. It introduces ten exhibits that show the formulas, that show the protocols, that show everything. I don't know what he's talking about that there's no specificity here and that the affidavit and the complaint just bounce back off each other in vagaries. That's simply not the case. He can argue that all he wants. It's just -- it's here. It's just not true. At all.

With respect to an ask for a $10 million bond, Founder's counsel is kind of talking out of both sides of its mouth. On the one hand, they say we don't use this procedure anymore. We don't use it at all. We don't -- whether or not -- if Justin McCormick brought it in with him at one point,

we put out six videos describing step-by-step instructions on how to do it and we uploaded documents with all of your formulas in there, and regardless if he's got a new website up there, by putting our address on there, explaining that same process as being used today, we don't use it. We stopped. We do something completely different. We don't use anything related to that. But they're not -- they're willing to give us the template spreadsheets back that we already have because they uploaded them to YouTube, but they're not willing to say we won't use that process or the procedures that were the subject of, I don't know, six 45-minute videos showing step by step how to use this formula, what it does, why it works.

So they're saying we don't -- we don't use it, so they shouldn't be heard at all. If the Court entered an injunction to say you don't use that procedure, which they are saying they don't use, then they're not damaged in any way. I don't -- I don't understand what that -- how that argument works. We don't do it; but if we're ordered not to do it, it's going to cost us $10 million and not being able to do our work.

Their inability to use our trade secrets is not even weighed in the balance of harms that they need to use it to -- in order to do their work. That doesn't even enter into the balance, that they need to use our trade secrets or our formulas or our procedures.

And to the extent they're saying that they've

automated that in some other way, they've taken what we do and wrote a computer program to do something, to do the same thing, our position is that is still -- that's -- first of all, we're going on their word, I don't know. But the arguments are just -- they don't meet what's been filed. The fact that, you know, this is -- they're just vagaries and not specified is just simply untrue. The fact that they haven't -- you know, still claiming he hasn't seen the documents. They've been sent to you in two forms.

We're happy to enter a protective order on this. They -- he -- he's talking about how complex and everything is now. They're going to need experts. Mr. Halligan has always taken the position: We don't need a mediator, we don't need a judge, just the attorneys talk, we'll figure it out. Our position has been this is more complex than that. Radio silence. Radio silence.

So they want their cake and eat it, too. They're arguing both sides. You've got one defendant arguing that things that are here, in detail -- formulas, scripts, examples, exhibits -- and, frankly, because he raised those issues when we sent the initial form of the complaint, which has been substantially updated and reworked. We had to go all this extra mile and do all this stuff and do further sleuthing and figuring out where they -- where all this stuff is, and now we find this week they post a new website with -- with -- listing

the same process and espousing how he -- how he came -- how he, Justin McCormick, created these scripts, created these formulas and his first stop in cryptocurrency tax. That's why we're here today. And that is why what they're saying about "It's just too vague, we don't know what they're talking about," is untrue. And that's why, if what they're willing to say, if -- they're not willing to say, "Court, you can't order us not to use this procedure, but if you do -- we don't use it anyways, but if you do, it's going to cost us $10 million of damages." I think it's preposterous.

THE COURT: Okay. How about on this issue of the timing and, you know, the TRO before tax day? Any response from the plaintiff on that?

MR. HUGHES: I'm not sure what you're asking, but even more so. I mean, if they're using our trade secrets to do all the work they're doing, that's the time where we're going to feel the most harm because that's work they're doing using our -- using our trade secrets.

THE COURT: Okay. So let me just ask one question, which is: Is anyone aware of, in the case law on the TRO and PI standard, whether the balance of hardships can include consideration of the harm to third parties? So, you know, in this case, the Founder's clients. Does anyone know? Because it probably says it somewhere in the case law --

MR. HUGHES: I don't think it -- it might -- that

might come into play in the public interest prong.

MR. BINA: Your Honor, I do -- I do believe that is generally a proposition in the case law. I don't have it in front of me, in part, because as we've already mentioned, this came to us at 5:00 o'clock last night. The FedEx truck I don't know ever delivered the unsealed version. I've not seen it yet still. So we've not, of course, had the opportunity -- my partner and I have only been working on this for a few hours this morning, so we haven't been able to find that case yet, but -- but I think that's an extraordinary part of this. And it does go to the public interest.

Who really is most affected by this order are, unfortunately, the clients of this firm, of our firm, who, in four days, have a deadline due.

And to be honest, that's why I raised the bond issue. We're not trying to talk out of both sides of our mouth. We're simply trying to put that very upfront, that I don't know that a TRO is the right remedy for what they're doing. They may have a breach of contract claim. We can fight that out and be heard on the merits in due course.

The point is why is the emergency today? That's where I think the TRO steps off.

But just to answer your question, your Honor, I do believe the case law does provide for that, your Honor.

MR. HALLIGAN: I think there is, your Honor. As part

of the weighing of the equities, you look at third-party interest that would be affected. I think sometimes it's included in the public interest analysis, but we can provide cases to that.

THE COURT: Because here's what I would be inclined to do. I would ideally like to know the answer to that question, but I guess I would be surprised if the answer to -- right now, I have not had an opportunity to do research, I'm kind of trying to do here. But I -- but I guess what I would say is in general all these injunctive relief, TRO, PI, anything related to equitable injunctive relief, you know, all of it is very discretionary and it's supposed to be taking into account all the practical consequences of the injunction. And so I would be surprised if I were not allowed to consider the effects on third parties, given that we're talking about equitable relief.

What I would say is that I think the TRO motion and memo and the affidavit make a pretty detailed and strong showing of -- you know, on the likelihood of success on the merits of the trade secret claim, at least for TRO purposes.

So, again, we're now at the emergency injunctive relief stage. And the standard for that comes from the *Mays v. Dart* case, which you cited. And so let me just say what that standard is. It says: "To obtain a preliminary injunction, a plaintiff must show that, one, without this relief, it will suffer irreparable harm; two, traditional legal remedies would

be inadequate; and, three, it has some likelihood of prevailing on the merits of its claims. If a plaintiff makes such a showing, the Court proceeds to a balancing analysis where the Court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the Court were to grant it. This balancing process involves a sliding scale approach. The more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor and vice versa."

And so that's from, again, *Mays v. Dart*, 974 F.3d 810 818, Seventh Circuit, 2020.

And, again, let's talk about the preliminary injunction standard, but the TRO standard is very similar. It's just that a TRO is -- it is even more emergency than a preliminary injunction. And a TRO is limited by the rules to 14 days, and it can be extended for another 14-day period, a TRO can, so a total of 28 days, total. After that, it becomes a preliminary injunction. So the TRO is just the initial extremely emergency form of injunctive relief.

Then you have the PI, which is also emergency relief, but a little bit more extended, you know, time to do discovery if you need, hold a hearing if you need, just have more process, even though it's also more expedited than obviously the entire merits of the case.

So at the TRO stage, I need to look at these same

factors. Is there irreparable harm? Are traditional legal remedies inadequate? Is there some likelihood of prevailing on the merits of the plaintiff's claims? Has the plaintiff made those showings? If the plaintiff makes those showings, I proceed to the balancing analysis, weighing the harm that the denial of the injunction would cause the plaintiff against the harm to the defendant if I grant the injunction. And using the sliding scale approach, the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor and vice versa.

So how does that all -- you know, how does that work out here?

My inclination, just given -- so, again, I think the showing on the merits by the plaintiff is detailed. I mean, it's explained. Plaintiff explained with the affidavit, with all those exhibits to the affidavit, Exhibit 7 with the very detailed process steps, some likelihood of prevailing on the merits of the claim that there's a protectable trade secret. It doesn't need to be -- it's just some likelihood. And the *Mays v. Dart* case explained what it means to -- what does it mean to establish some likelihood of success on the merits at the preliminary injunctive relief stage, and it's not better than negligible. It's some likelihood of success. What amounts to "some" depends on the facts of the case at hand because of our sliding scale approach.

So I would say for purposes -- for current purposes, which is we're very early on, it's just -- we're having to work with the information that we have right now, which is limited because, of course, the case was just filed, we haven't been through discovery, all of that, but we just have to work with the information that we have, and I would say for -- based on that situation, there's been enough of a detailed showing that it satisfies the "some likelihood of success on the merits" of the protectable trade secret.

I also think there is enough of a showing of irreparable harm. If there's, you know, if there's a protected trade secret and it's being used, then that's -- to me, that's irreparable harm. I mean, you could try to get damages for it later, but it would be pretty hard to quantify.

And there's also just the release into the world potentially, as demonstrated by the prior YouTube videos which have been taken down. So I would say there's irreparable harm, and traditional legal remedies would be inadequate because, again, there's just a lot of difficulty in quantifying the exact damages from the use of a protectable trade secret.

And so then I go to the balancing analysis where I weigh the harm that the denial of the injunction would cause the plaintiff against the harm to the defendant if I were to grant it. I think that balancing process is where I -- I would proceed a little bit differently than I might otherwise, given

the fact that we are now five days before tax day. And I think what would make sense is to grant the portions of the injunctive relief that require the return of the templates, and Founder's agreed to do that.

In terms of trying to manage -- or enjoin the use of the process because of the harm to the clients of Founder's, I'm going to continue that portion of the request for injunctive relief. I'm not going to deny it. I'm not going to grant it. I'm going to continue it until we can have a hearing where I can hear from Mr. McCormick and the appropriate person from Gordon, you know, just explain some more what we're talking about.

On the face of the affidavit, again, I just said, I think there's some likelihood of success on the merits. It is not whatsoever a stretch to me that -- you know, you have this new area of crypto. There's correspondingly new tax requirements for it. I think I saw in the motion, unlike an established -- or a more institutionally established type of investment where you'd have longstanding infrastructure for preparing reports, you know, if you had a holding where the institution that holds the account is generating reports of transactions and all that, that it could be a lot more -- it could be a lot simpler to prepare taxes in that scenario than in this scenario where the underlying investment is pretty new. And so it's not a stretch at all to me that that could be a

protectable trade secret, the process for trying to gather that information and process it to a point where it can be reliably filed for purposes of taxes. I understand there is some, for sure, harm to plaintiff in allowing this to proceed through tax day, but I just think about, you know, the practical reality of, you know, what happens if all these clients are just sort of out of luck at this point a few days before the filing deadline.

So I think I will -- I think we can get the answer to that -- to that question promptly next week in a hearing. So if you could do, say, next Friday, April 19th, we can have an evidentiary hearing where we can hear from Mr. McCormick and Mr. Gordon on -- just explaining more of the process and what it involves and what's unique to Gordon and what, you know, Mr. McCormick and Founder's believe is -- what's their perspective.

MR. HUNTER: Your Honor, may I make one request, that we continue it to the 22nd, which is the next business day? Because I have a brief that's due on the 19th.

THE COURT: Let me just check.

I could do the 22nd.

Is that possible for the plaintiff and everyone else?

(Counsel conferring.)

MR. BINA: That works for me, your Honor.

MR. HALLIGAN: That works for me, your Honor.

MR. HUGHES: What was the -- the 22nd?

THE COURT: The 22nd. So Monday, the 22nd.

MR. HUGHES: What time is suggested?

THE COURT: I'm flexible, but we could say 10:00 a.m.

MR. HUGHES: Your Honor, I do note on my calendar here, it says the 22nd is Passover. It doesn't affect me personally. I don't know if it does for anybody else here.

MR. HALLIGAN: Could we have the start date maybe at 11:00 instead of 10:00?

THE COURT: That's okay with -- let me just ask, how long do you expect this to take?

MR. HUGHES: We potentially would be showing videos, portions of videos, and witness testimony, so I would think it would take a few hours.

THE COURT: Okay. Because if we start at 11:00, it's fine. It's just that we would need to then take a lunch break, probably we could keep that short, but we would need -- you know, it could wind up going, I guess, well into the afternoon, I mean, if people are okay with that. I could also set some time limits if we need that. You know, you have maximum --

MR. HALLIGAN: Well, we can go back to 10:00. I just worry about getting -- I come in from Naperville. I get caught in that traffic, so I was trying to get a little bit of a buffer.

MR. HUGHES: We can carpool.

THE COURT: Okay. Understood. So 11:00 is okay. Let's just plan then on taking a shorter lunch break so that we can make as much progress as quickly as we can, so maybe we do half-hour lunch break at 12:30 or something like that.

MR. HALLIGAN: Okay.

THE COURT: And then let me ask -- I mean, do you think we could have each party, you know, limit your presentation to two hours? That way, we just have some limits on this thing? Otherwise, it's just like -- if we don't have a plan in advance --

MR. HUGHES: Yes, I think we'll be able to make our presentation in that time, if not shorter.

MR. HALLIGAN: Each party has two hours?

THE COURT: Well, okay, I -- no, because then we have six hours, if we're having Founder's and McCormick, so I would say jointly.

(Counsel conferring.)

MR. HALLIGAN: Three?

THE COURT: So a five-hour hearing?

(Counsel conferring.)

THE COURT: I mean, that also doesn't account for any kind of rebuttal or reply, you know.

So I think, you know, just looking at -- I'm just counting the hours here. So if we start at 11:00, we do a half-hour lunch break -- maybe what we do is we start at 11:00.

We finish the plaintiff's testimony by 1:00, so we just go straight through, two hours. Take a half-hour lunch break at 1:30. We do two hours for defendants combined. So that would be -- that takes us from 1:30 to 3:30. Then we do half an hour for any kind of rebuttal by the plaintiff. And then we wind up -- that takes us to 4:00 o'clock. I know we could go later if we needed to, but I think we also start to get diminishing returns and people start to -- I think it's better if we just try to keep it focused.

So also in there I've not accounted for some kind of afternoon break, which will probably happen, and then realistically we're not actually going to end right at 4:00. It's going to be something later than 4:00. So let's just do that. Let's do -- I know that means you have, collectively, two hours, but I think it's probably just, on the whole, better for the entire day to be under those time constraints, so -- otherwise, it would just wind up going really late.

Okay. So let's do 11:00 to 1:00, plaintiff's testimony. 1:00 to 1:30 lunch. 1:30 to 3:30, defendants' collective testimony. And then 3:30 to 4:00, or a little bit later if we need to take a break at some point, any response or reply from plaintiff.

Okay. All right. Any other -- I mean, so then I would say once we get through that, I'll hopefully be able to make a decision on the TRO -- or the remaining or outstanding

continued portion of the TRO. Then we'll need to figure out, you know, what's the process for the preliminary injunction. But maybe we -- I mean, does anyone have any suggestions at this point for that plan? Or should we just revisit that when we get to the -- get through the TRO hearing?

MR. HALLIGAN: I think we revisit.

MR. BINA: Your Honor, I think we'll -- after that hearing, I think we'll be in a better position to figure out, because, of course, we may certainly need some discovery and a briefing schedule. We obviously want to be heard. We want to file a brief in response to the PI. But I think getting through that first hearing is a necessary step.

MR. HUNTER: Yes.

THE COURT: Okay. Any response from plaintiff?

MR. HUGHES: I agree with that approach.

THE COURT: Okay. Also let me just make sure I have the language of the TRO.

So the TR -- the proposed language of the TRO is in the motion, which is Docket 6. This is Docket 6 at page 2. Okay.

What's your, I guess -- it looks like part (a) of that proposed language is -- that's granted, because that's the return of files -- let me just -- maybe let me ask open-ended -- more open-ended.

Do you have proposed TRO language that effectuates

what we all just talked about?

MR. HUGHES: We do, kind of.

MR. HUNTER: So we have proposed something that's a little bit more particular but addresses what's in 5(a), paragraph 5(a).

(Counsel conferring.)

THE COURT: Okay.

MR. BINA: Your Honor, if it's helpful, we have an extra copy if --

THE COURT: Sure, that would be great. Thanks.

And, I'm sorry, have you already exchanged this language?

(Document tendered to the Court.)

THE COURT: Do you think --

MR. HUNTER: We have.

THE COURT: Okay.

MR. HUNTER: We were -- and this is what we were discussing.

We reached an agreement with respect to point one, I think, but they were -- we didn't reach an agreement with regard to the remainder. They wanted additional language. But I think what your Honor just ordered is with respect to point one, that we would -- which is paragraph 5(a) in their motion.

MR. HUGHES: Partially, your Honor. Our position is that their -- their one and -- what how they presented it was

one and two together equal 5(a), from our -- from our motion, what they proposed as one and two. Because one is only templates. And, frankly, we have those templates. They put them on YouTube and they linked the Google Drive to it, so we know what they have in that regard.

What we're looking for is all their usage of those templates and showing where those -- all those various things, where they're using our converter, where they've used our Tidbits, our All Transactions sheets with all of those things. So that's -- that's why we were -- that's part of what the issues between the parties were outside. But it's -- just these templates, giving us a copy of the template, and allowing -- if they still have, you know -- first of all, counsel for Founder's previously, when we were in discussions back in I think February, said they don't -- this is a very small part of their -- what they do, founder's does very little crypto tax reporting. So these ought to be a pretty finite set of documents if -- if what was represented to me is true.

And so what -- what our (a) is looking for is not just templates, but the usage of those --

MR. HUNTER: Your Honor --

MR. HUGHES: -- showing it.

MR. HUNTER: Paragraphs 1 and 3 of the agreed order address precisely that. We say, look, we will return all of the templates, spreadsheets, all of that information. And also

we're comfortable with this Court entering an order saying that we won't use any of that information.

MR. HUGHES: They're defining the information as the disputed information being just templates. And so one doesn't cover the return to us of where they've actually used these templates and the extent of -- which would show the extent of that usage. It's just these blank templates that we already have. And that they won't start from -- use of a template again, you know, in the interim. That's fine. But they've said that they've -- you know, that ought to be fine because their position is they have a completely different process that wasn't reliant or derived from our process.

THE COURT: Okay. What -- but --

MR. HUGHES: So for the purposes of what your Honor was going to enter, I think that it is return of any materials that are -- that contained or that utilized or started from our templates and the formulas that are embedded in there.

MR. HUNTER: Your Honor, we, according to paragraph 3, we are agreeing that we will not use the templates or the formulas embedded in them. We're saying there will be a court order indicating that we can't use that information. And should we be in violation of that, we would be in contempt of court. We're not planning to use that information. And that's why we drafted it a little bit more specifically so that it can be clear in the order what we are permitted to do, what we have

to return, what we are permitted to use, and what we are not.

The remainder of the questions is about how we calculate someone's crypto tax exposure is something that is -- will be the subject of the next hearing. And in that case, then your Honor can enter a different order with respect to, kind of, whether we have to gather -- I think they're talking about legacy information that we did for previous clients of ours and whether we used that information to assess previous clients' tax information. That goes more to discovery, and it's not to preserve the status quo, which I understood was the purpose of this particular proceeding, is to return all of the information and agree that we won't use it. And then this Court will enter a -- we'll have another hearing about whether or not that information is a trade secret and whether we have to try to gather whether we may have used a portion of what this Court considers a trade secret as part of someone else's tax calculation. I think that necessarily involves that determination.

So the way that we drafted this order, specifically paragraphs 1 and 3 of the order, was so that we return the information, which is clearly being identified by them and which is in dispute, and we promise that we will not use it moving forward until this Court rules whether it's a trade secret or not.

MR. HUGHES: Your Honor, I think we're comfortable

with that from -- at a -- from a TRO stage, in -- in kind of theory, right? So what they've done in the past is there for maybe future discovery, and so we can determine the scope of how much they've used it.

But as far as what they're spelling out as far as inventory, spreadsheet, there's sub -- there's all kinds of sub-documents that are -- all feed off of this that are included in Exhibit 7 and Exhibit 8 where it shows kind of our -- various other things. So just because that there's -- we included the inventory spreadsheet, the All Transactions spreadsheet, and the converters as kind of the glaring examples of that is not the sum total of what is there and what's shown in the videos that they're -- that they put out, which is our unmatched transfer worksheets, the prep workbooks, all these things that are -- that Mr. McCormick describes in these videos. This is -- that is our creation and our process. We don't want it to be that limited to these three spreadsheets that they're -- that they're agreeing.

MR. HUNTER: Your Honor, so we're clear, we actually started processing crypto tax in 2018, well before we ever met Mr. McCormick, so we have a process in place well before this could have even been an issue.

MR. HUGHES: And so it would seem that if they're precluded from using our method, that they ought to have a ready-made method, and that damage or harm to any third parties

seems to be out the door because they've got their process that they could use.

THE COURT: Right. I don't know. I mean, I -- the more I think about it -- so the more -- I know I already, you know, I already told you what I was planning to do, but the more we talk about it, the more I think -- I mean, it is sort of a fair point from the plaintiff that if the defendants have a separate process that's independent, then they should just be able to use that. And I -- you know, like, now that it comes down to actually wordsmithing the order, I thought it would be practicable to do this sort of -- you know, defer part of it and defer the part that's talking about whether the -- or that's considering whether -- you know, what is the process exactly and is it protectable, but that's actually -- now, as everyone is talking more about it, it strikes me as maybe unworkable to do that, and so maybe I'm just going to return to the -- grant the TRO. I just -- the more we go around and around, the less workable this seems, so I think let's just go back to that.

MR. HUNTER: Your Honor -- oh, I'm sorry.

THE COURT: No, no, no, I just get that that imposes costs on third parties, for sure. But at a -- like I said, I think there's a good showing on the merits of -- likelihood of success on the merits, irreparable harm, and so it's really just sort of that concern about the kind of disruption to the

tax deadline that I was worried about, but this just is too unworkable to figure out how to do it, so let's go back to the TRO.

MR. HUNTER: Your Honor, if I may be heard on that last particular point where we mentions that if we have a completely separate process that we did before, the problem with his iteration is that they are claiming that the separate process that we engaged in before we ever knew this person is part of their trade secret. Right? So the process that we went through in order to calculate our clients' taxes, they are claiming the process is actually theirs, even though we were engaged in portions of that process before we ever met them or Mr. McCormick. So that's why we are worried that if we calculate our taxes for our clients pursuant to the way we have been doing it, they will claim that this is part of the way that they do it.

It's essential, according to our client, to engage in these processes in order to figure out what the tax exposure is. That's kind of our point. And so telling us that we can't do that, that we are -- prevents us from being able to actually calculate these things in the way that we were doing them before we knew them.

THE COURT: But -- okay. I think then the issue becomes more -- okay, the defense could raise this argument in a motion to dissolve the TRO that has evidence and argument

explaining how their process is different and it dates back to 2018 and it was independently developed, and I also think that it's -- you know, I can consider all that -- once there's an order, then the compliance with the order is an issue for contempt proceedings. And in the process of the contempt proceedings, I can consider equitable things like, okay, you guys have -- you have been in operation since 2018, you have clients that needed their stuff finished by the tax deadline, all that, I can -- I can consider that, because contempt proceedings like injunctive relief are also equitable and considering all the circumstances.

So I guess I -- I think we are at a point where I am going to grant the TRO as requested.

MR. BINA: Your Honor, on that piece, may we request a bond under rule -- let's see --

THE COURT: 65.

MR. BINA: 65(c).

THE COURT: Yes.

MR. BINA: And I just direct your Honor to the *Mead Johnson* case. That's 209 F.3d 1032, quote: A bond is a condition to preliminary injunctive relief.

And, of course, the purpose of the bond is to protect the defendant against damages caused by the TRO.

THE COURT: Okay. So what is -- I know you mentioned this before, but can you just say again what your argument for

the amount of the bond is, from the defendants? And then I'll ask the plaintiff for your view on that.

(Counsel conferring.)

MR. BINA: So, your Honor, the obvious concern is, as drafted, the plaintiff's TRO would effectively prohibit our client from really performing any of its activities in the next four days, or at least 14 days if the TRO is entered, of course during a very crucial time period. The tax deadline is April 15, as we all know. There's a number of things that this employee certainly does for a client.

I think it's -- the Court can take judicial notice that if a client's tax forms are not filed timely, there would be attendant negative consequences to that client from the IRS. Certainly -- and, again, that's part of the challenge we have here, your Honor, is without that level of specificity or holding a hearing so that our client could demonstrate the number of clients affected by this, that's why I think, again, just going back to the idea of setting the order as originally contemplated so we could be fully heard, but, ultimately, the issue is our client, if it cannot process or use its capabilities to conduct its work for these clients, the clients' returns will not be timely filed, which could result in a number of negative consequences. And it's difficult to quantify those, of course, right?

So that's why we suggested a very high bond, to

protect us in case there is these negative consequences, which could be tax penalties from the IRS, which could be claims from the clients for, you know, an improper failure to file the returns on time or the like, and just the general uncertainty with this whole process.

So it's difficult to figure out how, but we'd suggest a very large bond, given the large number of clients that are likely involved here.

THE COURT: Okay. What's the response?

MR. HUGHES: The response is a couple. We're happy and fine with language in the -- being added to the TRO that says nothing in the TRO prevents the defendants from using the processes and procedures that were in place at Founder's prior to Mr. McCormick's hire. That seems to be that they -- that that would -- you know, they've claimed that their process -- or that are not in any way derived -- you -- reliant on or derived from those.

But also counsel for Founder's has told me, has represented to me, that crypto tax work is very little -- very little portion of what they do, and now we're hearing that there's something different.

And so I don't think that a bond amount should be very high here if they are -- if they don't -- if they're using the processes that are not ours, that they are claiming readily that they have at the hand and at the ready that they've

developed, and with the -- you know, there's been no showing of what level of customers -- clients, excuse me, that this affects other than I've been told it's very little and now we're hearing it's potentially very large.

MR. HUNTER: I think the issue is the size of the exposure, right? It is -- we don't know how large the clients' cryptocurrency holdings are and, therefore, can't calculate how large the penalty will be in the event we fail to file on their behalf.

Also the request, as they have drafted it, asked that Mr. McCormick no longer be able to work on these files.

THE COURT: Okay. I think that if we add the caveat that plaintiff described, so, you know, just add some language -- so I can see how -- for example, something like that paragraph 5(b) in Docket Number 6, "a temporary, preliminary and/or permanent injunction prohibiting McCormick from providing services to Founder's that are the same as or substantially similar in nature to the services McCormick provided to Gordon Law." I mean, I -- so, I mean, what -- as long as McCormick does, you know, uses his own independent experience and uses Gordon -- I'm sorry, Founder's method or process, then he should be -- it should not be that he can't do any work. I mean -- so that 5(b) looks sort of overbroad, maybe, if -- unless we put in, you know, the qualifier that you were referring to.

MR. HUGHES: I'm fine with that qualifier. 5(b) goes to the inevitable disclosure because he's -- he learned it at -- even as he espouses on his new website where he learned these scripts in his first stop, which is our client.

So 5(b), for us, is -- goes to the -- we don't -- we don't see how Mr. McCormick can compartmentalize not using this process -- if they had a process that they say they had in place in 2018 and are using, and now they're using something completely different, this is what they're -- this is -- this is what they've said, then we don't think Mr. McCormick is -- he's not -- he's -- this new website he just put up puts the same process on there. So even though there was letters and communications with his attorney and counsel, it doesn't seem like there's -- that that even has brought him back into the fold. So he's still espousing it. We think (b) is the inevitable disclosure, that he -- there's no way he could work in that capacity and not be using our -- be using our confidential information trade secrets.

MR. HALLIGAN: Your Honor, I'd like to respond on behalf of Mr. McCormick.

I mean, this essentially takes away his livelihood. How are you going to counsel he -- he -- providing services to Founder's that are the same or substantially similar in nature to the services McCormick provided to Gordon Law.

Plaintiff is saying that that's going to be everything

he does. And, in fact, under the inevitable disclosure doctrine, he can't do any -- he can't provide any -- any services, in essence.

And so that -- that would be -- that would be overbroad, and I think it goes far outside the record of what is appropriate for this kind of a preliminary order.

MR. HUGHES: Mr. McCormick is an attorney, your Honor. I don't think preventing him from providing these services -- which he's shown through conduct already and then repeated conduct, even after being confronted with it -- from one small niche of the legal and/or accounting financial area that in any way would take away his livelihood.

THE COURT: What was the qualifying language that you proposed?

MR. HUGHES: Notwithstanding anything in the order that the -- that defendants would be allowed to use -- not allowed, but may use the -- any of the procedures and methods for preparing cryptocurrency tax reports in existence prior to their hiring of Justin McCormick and/or that have been developed independent of any of our information.

THE COURT: Okay. And in terms of a bond, I know the defense position is -- I'm sorry, the plaintiff's position is it should be low because as long as that qualifying language is there, plaintiff -- or, sorry, defendants can continue to use independently developed information.

So Rule 65(c) requires: "The Court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the Court considers proper to pay the cost and damages sustained by any party found to have been wrongfully enjoined or restrained."

If we have that language that preserves the ability of the defendants to use independently developed information, then I think that does, you know, substantially reduce the potential costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

So I -- I still think it's worth having some bond, just, you know, as an incentive for the plaintiff to -- you know, what you've requested, you know, that's meaningful relief, particularly now, a few days before the tax deadline.

So what are the parties' proposals as to the amount of the bond?

Also remind me how it works. So when you go to get a bond, you have to front some portion of the bond, right, but not the full amount of the bond, so how -- what's your understanding of how much you would actually be putting up?

MR. HALLIGAN: There's been a lot of reported press on that. I don't know what that percentage is.

MR. HUGHES: Yeah, I -- we'd have to probably work through that with the financial -- the bond issuer.

THE COURT: Okay.

MR. HUGHES: I know it used -- you know, used to be kind of a rule of thumb, it was like 10 -- 10 percent. I don't know that that holds true anymore.

THE COURT: Okay.

MR. HALLIGAN: So our number?

MR. HUNTER: We request at least $2 million bond.

THE COURT: Okay. What's the --

MR. HUGHES: Our position is it was in our motion for $1,000 bond. I mean, we'd be willing to go more than that. But $2 million, to the extent that they've espoused to the Court they've got an independent method already baked and cooked before McCormick got there, I don't -- I don't see the showing of the need for the exorbitant number, especially because they haven't articulated -- they've articulated to me independently this is a small part of their business, and now somehow they're articulating it's a large part of the business. I just don't think there's any showing of that -- of that need.

MR. HUNTER: For the record, I have not ever indicated what part of the business it was, and I don't believe my co-counsel has --

MR. HUGHES: No, neither of them. Neither of them. No. But I believe their partner, Ms. Wilbert, is the counsel I had discussions with when I was having discussions also with Mr. Halligan prior to filing.

MR. HALLIGAN: It would be our position 1,000 is -- it

simply doesn't take into consideration the seriousness of what's going to happen here when this Court issues this order, and it should be a substantial bond. I would have gone higher than 2 million, but I conferred and we decided that would be the number.

THE COURT: Okay. I guess what I'm having some difficulty with here is -- I just feel like I lack information on this front. There's -- so -- I mean, it's "security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." I don't have great information about, you know, how much of the business is it for the defendants.

So what I could do is set a bond now and then -- because that's just the nature of a TRO, got to go with whatever info you have, even if it's limited. And then if people want, you can file motions to increase or reduce the bond. I've seen that occur before. And you can support that with more information.

So at this point, again, I've got pretty limited information, so -- and I do think that the qualifying language that the plaintiff proposed does diminish the risk of wrongful -- of a wrongful injunction.

And so with that in mind, what I'd be inclined to do is set the bond at $100,000. And then you all can file motions to modify that amount, if and when you have more information

that tells me what that -- that gives me more of a basis for, you know, what that should be.

MR. BINA: Your Honor, I'm sorry, just to clarify, for the record, will the order indicate that the TRO is granted in part, denied in part, just in light of that modification of the exception?

THE COURT: Qualifying language? Or the modification of --

MR. BINA: Yeah, sorry, the -- I think the ability for him to continue to work. I just want to recognize what the order is likely to say.

THE COURT: Yes.

MR. BINA: It's granted in part and denied in part?

THE COURT: So I -- first of all, can I just ask the plaintiff to send a proposed order to the proposed order box, like just a Word format --

MR. HUGHES: Certainly.

THE COURT: -- order. And it should look like what you put in your motion, but add the qualifying language we discussed today.

And we can go back if anyone wants to try to -- what was that language? It was --

MR. HUNTER: "Defendants may use any procedure or methods for preparing tax reports that they independently developed for calculating crypto tax exposure."

MR. HUGHES: Yeah, I think it was -- it was "in use prior to Mr. McCormick's employment and independently developed."

THE COURT: What I have from earlier is "notwithstanding anything in this order," meaning the TRO, "defendants are allowed to use or may use any of the procedures and methods for preparing cryptocurrency tax reports in existence prior to their hiring of Justin McCormick and/or that have been developed independent of any of plaintiff's information."

MR. HUNTER: That's fine.

THE COURT: Okay. So with -- sorry. That's okay from the defense? I know you're opposed to the TRO --

MR. HUNTER: Yes.

THE COURT: -- but that specific --

MR. HUNTER: Yes.

THE COURT: Okay. So with that -- let me go back to the question of does that mean that the motion for TRO is granted in part and -- or is it just outright granted?

MR. HUNTER: Can Mr. McCormick work on these things? Because that's one of the things they asked for, that he be completely screened from working on any of this. I thought your Honor was inclined not to grant that part of the TRO.

MR. HALLIGAN: That's what I'm concerned about, that it's going to be construed that essentially he can't work. And

that's just not supported by this record.

THE COURT: I mean, is that what you're asking for, that he just can't work at all?

MR. HUGHES: No, he can't work in a capacity in which he's preparing crypto tax reports. He can do any other kind of law work or anything else.

MR. HUNTER: That's his job.

MR. BINA: Your Honor, if I may? The complaint says: "Specifically including he may not work in any position related to Founder's CPA's provision of cryptocurrency tax reporting services."

That's very broad. That would put him on ice.

So, again, I think it would be more procedurally proper to grant in part, certainly what the Court intends on doing, denying in part the portion that seeks to specifically -- again, it's subset (B) of their complaint. I'm reading their papers. Deny the portion that would seek to hold him out entirely, and allow that -- we'll say additional language to clarify that he may continue to work, provided we're not using the, you know, disputed information.

MR. HALLIGAN: I mean, there was -- it's drafted providing services to Founder's that are the same or -- as or substantially similar in nature to the services McCormick provided to Gordon Law. So --

THE COURT: Okay. I -- here's the problem. This

is -- you're asking me to make a call when I don't have the information that I most need to decide this, which is that hearing. And so I guess now I -- I know TROs are -- that's how a TRO is. You have limited information. You've got to just make the best call you can based on the limited information.

So what I'm going to do is -- and the limited information I have is that, yes, unfortunately, he -- that is his job, he's a crypto tax professional. But, unfortunately, sounds like he learned a lot of information and was trained and had no other -- he was directly from law school, and it sounds like this is pretty specialized. And we have info from what happened with the YouTube postings that -- and the repeat use of this Tidbits language, that what he's doing now is still relying on what he learned at Gordon. And so that's very unfortunate, as is the timing a few days before tax day, but I sort of, you know, like, I don't -- all of this is unfortunate but I -- based on the limited information I have, then, yes, I think that's basically the result is he can't be -- unless there's some way, I mean, consistent with the qualifying language that's going to go in there, that he can -- that he can comply with the order, then, yes, I think that's, unfortunately, the consequence of this.

The way that you -- a way that you could resolve this is if everyone could come back here tomorrow and we hold a hearing tomorrow, but I realize that doesn't help everyone much

because that's even closer to tax day.

So I just -- you know, this is not -- none of this is ideal, but it's just sort of the best decision I can make based on the information that I have, which is limited.

MR. HUNTER: May I just ask --

THE COURT: Yes.

MR. HUNTER: -- two more clarifying questions?

First, with respect to Mr. McCormick, I think I heard you saying that it is granted except for -- to the extent that he is relying on whatever the qualifying language is for that information? Or are you saying that he is completely barred from participating in this part of the business?

THE COURT: I think -- I think we're going to add that qualifying language, if -- so now this is where it gets tricky because the question is can you read, I guess it's 5(b) -- yes, 5(b), paragraph 5(b), can you read that in a way consistent with the qualifying language -- so the qualifying language is going to say "notwithstanding anything in this order."

So if he's able to practice in a way -- so that qualifying language is going to be exception to all of this, including 5(b). So if he's able to practice in a way that does not rely on whatever that language is in the order, then he should be able to practice.

And I guess that -- trying to determine whether he's able to do that is an issue for -- so can he implement some

pre-existing Founder's process without relying on the confidential information that came from the plaintiff is basically the question. And I guess the plaintiff probably thinks he just fundamentally cannot do that. The defense may have a different view?

MR. HALLIGAN: Yes.

THE COURT: Whether that is or is not possible is something that -- I don't know that I can resolve that today. That's a question for contempt proceedings, I think.

MR. HUNTER: Fair. Also, with respect to 5(a) after the semicolon, it says that we will: "Cooperate with counsel for Gordon Law in connection with implementing a protocol to ensure that all information is returned to Gordon Law and permanently erased and deleted from any electronic storage repositories."

Was your Honor intending to enforce that provision before a decision on whether these are trade secrets?

THE COURT: Yes, because that's all based on, you know, my conclusion that there is a likelihood of success on the merits -- or enough of a likelihood of success on the merits to warrant the granting of TRO relief.

So, I mean -- I think that is appropriate. I mean -- so, yes, it puts everyone in a tough spot because we haven't had the full process on the merits yet, but that's --

MR. HUNTER: May I suggest that we delay that

particular portion until after we've had -- because it's not clear the scope of what they're claiming is -- so we have no issue kind of capturing and returning it, but I think it might make more sense for the Court to determine precisely what they are so that we know kind of what we are being asked to retrieve and to provide. And we're happy to do that immediately after this Court enters an order, whichever way, deciding what the trade secrets are.

THE COURT: Okay. What's the plaintiff's response?

MR. HUGHES: Our response to that is kind of the same. It's kind of rehashing, I think, you know -- at a minimum here, they would need to return any iteration of the spreadsheets and the All Transactions spreadsheets and the -- any -- any spreadsheets or documents that they prepared off of the templates that we've clearly shown are the same. And so, at a minimum, those ought to be pretty easy to find.

And that's the part the Court is -- I believe your Honor is finding there's a -- you know, there's been the adequate showing of likelihood of success on the merits, which necessarily includes the likelihood of success that the information sought to be protected is a trade secret.

And so our position is that, at a minimum, they would need to search for and gather all of, not just the templates, but where those templates were then populated and used.

MR. HUNTER: Your Honor, I believe one of the issues

that I had when that request was made was we are being asked to destroy client information that we might have an ethical obligation or a legal obligation to hold, on their behalf, by the IRS. Right?

So I am -- I am not sure kind of if -- how that -- which information should be segregated, how it should be segregated, whether or not we have a responsibility to hold it, and in what manner we would be required to hold it.

That's -- that's the reason I'm asking that it be at least delayed until your Honor has more information about that.

MR. HUGHES: We'd be willing to forego the language that says "permanently erased or deleted" at this time, or any destruction based on that consideration.

So they would need to find it and provide it to us, for those -- whether or not there's ethical considerations to their clients on maintaining files. So we wouldn't ask that they are permanently destroyed, at least right now. And down the road we can decide whether those get held by some other third-party agent for file-keeping purposes or something along those lines.

But we're fine with striking -- and, again, that -- it did say, you know, they've got to work with us on a protocol to do that.

So I'm fine with striking the "permanently erased or deleted," for the time being. And then we can -- at the

preliminary injunction stage, we can, and at the next step, we can decide whether or not that means that information goes to some other repository or third-party holder of that.

THE COURT: Okay. So then if we delete that, "and then permanently erased or deleted" -- which language would you delete? Is it the rest of that sentence, starting with --

MR. HUGHES: We would want it returned, at least copies returned, and then -- and, you know, protocol for storage of same during the pendency of the matter.

THE COURT: Wait. Where --

MR. HUGHES: I'm just kind of thinking as I'm looking at it.

THE COURT: Oh, I see. I mean, could we -- yes, so "is returned to Gordon Law" -- let's see, "and cooperate with counsel for Gordon Law in connection with implementing a protocol to ensure that all such information is returned to Gordon Law and" --

MR. HUGHES: "And held or maintained for appropriate safekeeping or warehousing." How would we want to --

THE COURT: Yes, "and stored during the pendency of the TRO," or something, or the TRO -- or "the preliminary injunction proceeding."

Could we just say "and stored until further court order," or "stored until further order of the Court"?

MR. HUGHES: Okay. So I would -- that would be --

starting at the line, after the semicolon, it would be: "And cooperate with counsel for Gordon Law in connection with implementing protocol to ensure that all such information is returned to Gordon Law and then stored" -- we even take "then" off of there. "Returned to Gordon Law and stored until further order of the Court."

THE COURT: Yes. I mean, I think that -- does that make any issues with that from the defense?

MR. HUNTER: Currently, I don't have any because I don't know -- we have proprietary information, right, like from our clients that I don't know if there are any kind of privacy or security issues that our client information would entail, so that working on a protocol makes sense.

I think, to me, it should say that: "Cooperate with Gordon Law in connection with implementing a protocol that all such information will be returned to a third party and stored until the Court further rules." Because some of that information is our client private information, right? And so I'm fine with having it stored by a third party or stored with the Court until this Court decides kind of which way to move that information and how it should be extracted or if it should be extracted. Those kind of things are particular because we have, you know, private information from our clients, from social security numbers to income to all of that, that they didn't agree to disclose to the plaintiffs.

THE COURT: Right. I mean, are you actually requesting that the defense turn over client files to you with --

MR. HUGHES: It would be the -- to the extent that there's spreadsheets and the formulas were used to calculate those internal reports that are not reports made to the government, but the internal reports for -- on the way -- yeah, I mean, that's going to -- that is going to -- that's the only way to show what the level of -- of breach and misappropriation is.

I don't think any of those contain social security or other -- any -- just maybe the client's last name might be attached to the file name.

THE COURT: It just seems like that -- I mean, it's going to have to be redacted or -- like, you can't just get all the client files unredacted, can you? I mean, that just seems odd to me. I mean, completely unredacted client confidential info -- I understand what you're saying --

MR. HUGHES: It's not --

THE COURT: -- but --

MR. HUGHES: I don't know that the info itself is confidential.

THE COURT: Well --

MR. HUGHES: Our formulas and how that information is treated -- this is all, you know, tax information and stuff

that's reported to the government, number one, or that is being raked or pulled from certain -- you know, this is cryptocurrency transaction data --

THE COURT: But, I mean --

MR. HUGHES: -- manipulated in a very specific way so we can make it to -- you know, various different things, talk to each other and get calculated properly.

THE COURT: Well --

MR. HUGHES: We can have them make an index.

THE COURT: Or maybe some kind of -- but couldn't it be maybe redacted so that at least the client's identity or something is not disclosed --

MR. HUGHES: Yeah.

THE COURT: -- or the -- and personal identifying information of the client is not disclosed, like social security number and --

MR. HUGHES: Yes.

THE COURT: -- that sort of thing.

MR. HUGHES: Yes, we're more than -- more than fine with that.

THE COURT: Okay. That sounds like a thing that could be worked out as part of the protocol.

So maybe at this point -- at this point, it seems like maybe it could be -- it's sufficiently -- that issue, "it," meaning the confidentiality of client information, is -- I

think it's sufficiently addressed if we say: "And cooperate with counsel for Gordon Law in connection with implementing a protocol to ensure that all such information is returned to Gordon Law and stored until further court order." And we could even say: "Consistent with client confidentiality." And that way we know that we need to think about that issue when we're devising the protocol.

MR. HUNTER: Does your Honor have any estimate about the timeline in mind? We do not have an internal IT department, and I have no idea -- I just found out about this yesterday. I have no idea what the scope of what they are requesting us to do is. Happy to start working on the protocol immediately, but I don't want to run afoul of this Court's order saying that we are supposed to scrape, produce, and -- and scrape all of the PII from this information without -- during tax season and without an IP -- without an IT department.

THE COURT: I think -- so it's a fair question. As you're talking through those steps, it is -- I mean, it for sure could be potentially time-consuming, so I don't right now have a timeline on it. Is there -- I mean, is there any request from plaintiff as to a time frame?

My thought would be the -- the cooperation, if you're talking about it and working on it, that seems fair to me, given what that might entail logistically. So I -- I think --

I mean, I don't -- does the plaintiff have any request? Otherwise, I'd be inclined to just leave it as is, and it's not something where I'm going to be --

MR. HUGHES: I mean, it says two days in here, for the -- compelling the defendants to account for in writing and return all documents --

COURT REPORTER: I'm sorry, Counsel, can you --

MR. HUGHES: Oh, I'm sorry, I'm sorry.

In the actual language of the motion, it talks about two days.

Considering everything, we're happy to say that that takes place by a week from Friday.

THE COURT: Okay. Is that -- sorry. So if we change the "two days" to "April 19"? Will that work?

MR. HALLIGAN: Are we still having the hearing on the 22nd?

THE COURT: Well, let me just think through that.

I -- so right now -- when we talked about that hearing, it was because I was continuing the part of the TRO request. Now I'm granting the TRO request with the qualification we talked about -- or the addition of that additional language.

However, I mean, a TRO is usually a temporary -- I mean, it's temporary. Temporary restraining order. And it's supposed to be 14 days. Under Rule 65, it can be extended for

good cause to 28 days.

At that point, you know, once you're past the 28-day limit, it effectively becomes more like a preliminary injunction if it doesn't have -- if it's indefinite.

And so I guess I -- I think because that information that we would do during the hearing -- I mean, it would be helpful to me in determining whether this injunction should last past, I guess, the immediate 14-day and potentially 28-day length of a TRO. I mean, that would -- that would help me in terms of determining whether to impose a preliminary injunction or -- you know, extend this TRO to something of a more indefinite duration while the merits of the lawsuit are going on.

So I still think there's a -- you know, it's actually helpful to have that hearing on the calendar.

I mean, does anyone see it differently?

MR. HALLIGAN: No. I think, you know, the Court's perception of what the record -- or what the state is now, I think it will be clarified when you hold this hearing.

MR. HUGHES: We're of that opinion as well.

Is the hearing, just so we're clear, to address the single issue of the information and whether or not it is to be considered a trade secret?

THE COURT: Well, I mean, that's a good question.

So I think the April 22nd hearing, it would

effectively be a P.I. hearing. I mean, that's what we're talking about.

And so if you want to present more information than just that issue of is it a trade secret, then we should talk about, you know, do you need more time to prepare for that? Do you need some kind of discovery to prepare for that?

But, like I said, I -- you know, the TRO -- there's a time limit for TROs. And so I would like to get it, the P.I. hearing, done ideally -- unless the parties agree to go beyond that 28-day outer limit for a TRO, then I think we've got to hold the P.I. hearing in a reasonable time frame and ideally within that 28-day time frame.

And so I guess 22 -- sorry. April 22nd is within the initial 14-day period for the TRO because that would be April 24th. The 28-day period goes to May 8th, which is also a Wednesday. So if you think you need more lead time to prepare for a P.I. hearing -- if, for example, you think you need some discovery, if you think you want to present on other issues besides that trade secret issue, you need to line up other witnesses, you know, whatever you would like to do on that front, if you think you need more time to prepare, we can move the P.I. hearing maybe to the next week, the week of the 29th. I guess, theoretically, we could move it to even the beginning of the week of May 6th.

But, you know, that's something you -- do you have any

initial thoughts on that? Do you want to take some more time to think about it and get back to me?

MR. HUNTER: I think we can -- between now and the hearing, if we -- as we are trying to develop what we plan to say, if we discover that we need more time, we'll certainly ask plaintiff's counsel if they would be amenable, and then make a motion to the Court to move the hearing and -- you know, if we can't reach an agreement, of course, with the -- in conjunction with the Court's schedule, if we determine that we need more than what has already been laid out.

MR. HUGHES: I'm comfortable with that, your Honor.

THE COURT: Okay. So, for now, we'll keep the hearing on the 22nd. And if anyone thinks you need more time to get ready for that, we can -- you can just please reach out to the courtroom deputy and we can get that reset.

MR. HUGHES: I would ask if, the 29th -- I have an arbitration that starts the 23rd, and so -- not that I think this would bleed into it, but just for prep for that, I don't know if -- I don't know if plaintiff is fine with the 29th. I can do the 22nd, if need be.

MR. HUNTER: The 29th will not work for me.

MR. HALLIGAN: The 22nd is all set up, right? We worked out the time period so that everything is set up.

MR. HUGHES: That's fine.

THE COURT: Okay. So, I mean, if there are any

proposed changes between now and then, just let me know.

Between -- I'm sorry. Did we decide what happened with the document production between the -- did we lock in the April 19th deadline between the TRO and the P.I. hearing? I think we did lock in the --

MR. HUGHES: I thought we did, yes.

THE COURT: -- April 19th deadline.

So if -- I mean, if I can ask the plaintiff to please send to the proposed order box a revised Word document version of what you proposed with the modifications we talked about today, that would be helpful.

I will also just put in place that that TRO is going to expire in 14 days, so it goes -- it expires on April 24th, unless you move to -- the plaintiff moves to extend the TRO, and I find that there's good cause to extend the TRO, in which case I can extend it for another 14 days, which would then take us through May 8th.

But I'm just, I guess, making clear now, and then I will also make clear in the text of the TRO, that that's what this is. It's a TRO. It's temporarily in place. It's lasting 14 days. As permitted under Rule 65, it's going to expire on its own terms unless it's expressly extended. So it's not indefinite duration. It's not actually -- it's not an injunction that's labeled a TRO, but, in fact, is a preliminary injunction. It's a true TRO that expires 14 days from when

it's entered.

Okay. All right.

MR. HUGHES: Do you want me to submit this in a redline form or just a clean form?

THE COURT: I think just a clean form is fine because I think I can remember what we talked about.

MR. HUGHES: Okay.

THE COURT: Actually, you know what? Sorry. Do you mind just sending both --

MR. HUGHES: I'll send both.

THE COURT: -- and then copying, of course, opposing counsel, and then I'll take a look at it. But I'll add the 14-day limitation and then enter it.

And then we can proceed with the April 22 hearing, unless I hear otherwise.

Does anyone think we need some kind of status hearing in between or status report, written report? Or --

MR. HUNTER: I don't.

THE COURT: -- not?

MR. HALLIGAN: No.

MR. HUGHES: I don't think so, your Honor.

THE COURT: No? Okay. All right.

Well, if that changes, if you would like to report anything, please just reach out to the courtroom deputy or file a status report.

MR. HALLIGAN: Thank you, your Honor.

THE COURT: Thank you, everybody.

THE CLERK: This court stands in recess.

(Concluded at 4:16 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

*/s/ GAYLE A. McGUIGAN* September 7, 2024
GAYLE A. McGUIGAN, CSR, RMR, CRR
Official Court Reporter