**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE GORDON LAW GROUP, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 24-cv-2817 |
| | ) | |
| FPSG LLC, an Illinois Limited Liability Company | ) | Hon. Judge: Martha M. Pacold |
| & JUSTIN MCCORMICK, an Illinois resident | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF
ENTRY OF PRELIMINARY INJUNCTION**

Plaintiff The Gordon Law Group, LTD. ("GLG," "Gordon Law," or "Plaintiff"), by and through undersigned counsel, hereby files this Supplemental Brief in Support of Entry of Preliminary Injunction. For the reasons below, the Court should enter a preliminary injunction against the Defendants.

**INTRODUCTION**

Gordon Law practices in the burgeoning field of cryptocurrency taxation. Gordon Law hired Defendant Justin McCormick ("McCormick") directly out of law school, when he had no prior experience in the field of cryptocurrency taxation, and trained him in Gordon Law's internally developed procedures for completing cryptocurrency tax reports. McCormick eventually became a team leader in Gordon Law's cryptocurrency tax department and helped further evolve Gordon Law's proprietary methods, templates, formulas, and scripts for preparing cryptocurrency tax reports.

Within eight months, however, McCormick terminated his employment with Gordon Law and went to work for Defendant FPSG LLC d/b/a Founder's ("FPSG" or "Founder's"), one of Gordon Law's competitors. Despite signing a Confidentiality and Intellectual Property Agreement

(the "Agreement") while working for Gordon Law, McCormick took Gordon Law's proprietary process and procedures—including its templates, formulas and scripts—to FPSG and used Gordon Law's confidential information in his work for FPSG. Through a series of videos created by McCormick and FPSG—which they brazenly published on FPSG's public YouTube webpage, along with copies of templates and spreadsheets that are virtually identical to Gordon Law's, and which contain Gordon Law's proprietary formulas and scripts—Gordon Law became aware that Defendants were using Gordon Law's confidential information and trade secrets in Defendants' competing cryptocurrency taxation business.

Accordingly, Gordon Law filed suit seeking injunctive relief to prevent ongoing breach of contract and misappropriation of Gordon Law's confidential information and trade secrets. Count I of Gordon Law's Complaint alleges that Defendants McCormick and FPSG violated the Illinois Trade Secrets Act; Count II alleges that Defendants McCormick and FPSG violated the Federal Trade Secrets Act; and Count III alleges that Defendant McCormick breached the Agreement entered into by McCormick and Gordon Law.[1] (D.E. 1 ("Compl.") at 13-21.)

## GORDON LAW'S TRADE SECRET DEFINED

At the preliminary injunction hearing held on October 29, 2024, the Court requested that Gordon Law "narrow [its] proposed definition of the trade secret [at issue] and specify exactly what it is." Tr. at 603:16-18. In a subsequent order setting the post-hearing briefing schedule, the Court "reminded [the Plaintiff] that 'since an injunctive order prohibits conduct under threat of

---

[1] Count IV alleges that Defendant FPSG committed tortious interference with contractual relations by inducing, allowing, and ratifying Defendant McCormick's breach of the Agreement. Because FPSG is not contesting the entry of the preliminary injunction requested by Gordon Law, and because Count IV is exclusively against FPSG, the record shows that each element for injunctive relief under Count IV remains established. And McCormick lacks standing to object to injunctive relief under a cause of action to which he is not a party. Consequently, there are no arguments against converting the TRO into a PI as to Count IV against FPSG, and this brief will not address Count IV or FPSG's liability. [ADD COUNT 2]

judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely

what conduct is outlawed.'" (D.E. 165 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).)

Accordingly, Gordon Law specifies below its definition of the trade secret at issue. Plaintiff's trade

secret consists of the following





Plaintiff will refer to those collection of steps as the "GLG Process." As elaborated below, the GLG Process is (1) a trade secret protected under the ITSA and DTSA, and (2) confidential within the meaning of the Agreement.

**RELEVANT FACTS**

The following facts are either undisputed or supported by evidence in the record (as cited).

**A.      Gordon Law Spent Years Developing and Improving the GLG Process, Which Is Unique and Valuable in Gordon Law's Industry.**

As of December 2021—while developing the GLG Process up to that point—Gordon Law had:

- Spent years of trial and error attempting to understand the assorted fact patterns and legal ambiguities arising from the booming number of eclectic transactions using novel, fast-changing financial technologies (a.k.a. crypto);

- Sampled and tested multiple types of third-party A to Z software;

- Learned the advantages and disadvantages of those various software products as standalone solutions and, conversely, the advantages of crafting a bespoke crypto tax preparation process;

- Crafted that bespoke crypto tax preparation process by using limited components of third-party programs or systems, in connection with workbooks and workflows created from scratch in house at Gordon Law; and

- Created a mechanism to train employees with that institutional knowledge so that, on behalf of Gordon Law, they could provide clients with crypto tax preparation that was more accurate and efficient than the service(s) offered by competitors.

*See* Transcript from October 28-29, 2024 PI Hearing ("Tr.") at 32:2 – 38:14, 46:22 – 47:5, 57:9 – 58:15; 79:23 – 81:11; 260:8 – 263:16. Through its efforts, Gordon Law learned the advantages of efficiently creating crypto tax reports with accurate results that could be explained and justified in detail with blockchain data. *See id.* With that hard-earned institutional knowledge, Gordon Law developed the GLG Process to efficiently provide accurate crypto tax preparation. *See id.* By using that process, Gordon Law's tax preparers have been more efficient and adept than competitors at calculating, understanding, and justifying their tax treatment and calculations for assorted crypto transaction. *See id.*

Corroborating those assertions, David Canedo (Gordon Law's expert) testified that the GLG Process is unique and valuable, rather than generally known. Specifically, Mr. Canedo opined that the GLG Process provided an economic benefit by maximizing accuracy and efficiency via, *inter alia*, allowing for a level of internal control not available to competitors relying solely or primarily on third-party software. Tr. at 338:8 – 342:15. He further opined that, as an expert, he is unaware of others in the crypto tax preparation industry (other than McCormick and FPSG after their misappropriation) using the GLG Process, which required substantial experience and difficulty to create. Tr. at 342:13 – 344:12.

Despite having the opportunity to rebut that expert testimony, Defendants chose not to

submit their expert's testimony. They omitted that testimony, even though they had retained an expert whom Plaintiff deposed (at a substantial cost) for approximately five hours in preparation for the hearing.

### B.      Gordon Law Implemented Multiple Protections for the GLG Process.

Gordon Law undertook substantial efforts to protect the GLG Process. 58:16 – 60:13. Gordon Law provided employees with an employee handbook specifying what information should be treated as confidential:

**6.3 Confidentiality**

The Gordon Law Group Ltd. takes the protection of Confidential Information very seriously. "Confidential Information" includes, but is not limited to, computer processes, computer programs and codes, customer lists, customer preferences, customers' personal information, company financial data, marketing strategies, proprietary production processes, research and development strategies, pricing information, business and marketing plans, vendor information, software, databases, and information concerning the creation, acquisition or disposition of products and services.

Confidential Information also includes the Firm's intellectual property and information that is not otherwise public. Intellectual property includes, but is not limited to, trade secrets, ideas, discoveries, writings, trademarks, and inventions developed through the course of your employment with The Gordon Law Group Ltd. and as a direct result of your job responsibilities with The Gordon Law Group Ltd.. *Wages and other conditions of employment are not considered to be Confidential Information.*

To protect such information, employees may not disclose any confidential or non-public proprietary information about the Firm to any unauthorized individual. If you receive a request for Confidential Information, you should immediately refer the request to your supervisor.

Pl. Ex. 24. Gordon Law also signed confidentiality agreements with employees, specifying in relevant part:

1. **Confidential Information:** Company employees and contractors ("Users") work with confidential information belonging to Company and/or its clients. "Confidential Information" is any information, in any form or medium, concerning Company and any Company client and includes, but is not limited to, workpapers, templates for reconciling cryptocurrency transactions to generate tax reports, training videos, documents, manuals, software vendor contacts, documentation on best practices, usage tips for software, and all information regarding the highly efficient process for crypto tax reporting that was developed by Company, plus information relating to Company's and its clients' customer lists, pricing and fees, business records, products, research, marketing, advertising, sales, communications programs, forms, items, lists, methods of doing business, and related Company goals, objectives, profits and financial information, trade secrets, and any other information concerning Company and its clients, of whatever kind, that is used, compiled, obtained or acquired by the User or which may come to the knowledge or into the possession of the User. Confidential Information need not be marked, labeled, or otherwise designated "confidential" to be considered as such. Further, in many instances Company may be contractually bound not to disclose even the existence of a client relationship or of any discussions or agreements with an actual or potential client. All Company Users must therefore treat even the mere existence of an actual or potential client relationship or agreement as being strictly Confidential Information, unless such relationship or agreement has been declared by Company's president to be non-confidential. User's failure to maintain such strict confidentiality will be grounds for disciplinary action by Company, up to and including immediate termination of employment or engagement, in addition to other legal actions and remedies against such User.

Pl. Ex. 02.

To further protect sensitive data, Gordon Law utilized Google Drive with two-factor authentication. Tr. at 58:21 – 60:3. When onboarding employees, Gordon Law trained them to secure, and not share with third parties, or even other employees—their log-in credentials. *Id.* Gordon Law also limited each employee's account to have access only to the documents relevant to that employee's department. *Id.* For example, Gordon Law restricted employees in the corporate department from accessing files in the crypto department (and vice versa). *Id.*

Gordon Law also protected the GLG Process from disclosure by departing employees. *Id.* Upon an employee's departure, Gordon Law requested a signed certification that the employee "had not used or disclosed any Confidential Information, other than during the proper performance of [his/her] assigned duties for the Firm." Pl. Ex. 5.

Finally, Gordon Law trusted that its attorney employees would abide by their ethical duties to maintain client confidentiality and refrain from any dishonest conduct. Tr. at 60:04 - 60:13.

### C. Gordon Law Hired McCormick, Confirmed His Duties to Maintain Confidentiality, and Trained Him to Learn and Use the GLG Process.

In December 2021, Gordon Law hired McCormick straight out of law school. Tr. at 519:15 – 520:12. At the time, McCormick knew nothing about cryptocurrency tax report preparation. Tr. at 519:15-520:12. On June 24, 2022, McCormick signed an acknowledgment that he had received Gordon Law's employee handbook, which (as specified above) set forth confidentiality obligations. Pl. Ex. 04; Tr. at 64:20 – 69:24.

Gordon Law then spent 80 to 160 hours training McCormick in the internally developed GLG Process for completing cryptocurrency tax reports. Tr. at 520:17-522:1. During and as part of his employment, McCormick adapted, tweaked, or enhanced components of the GLG Process, which Gordon Law's employees continued using as part of their employment. Tr. at 57:12-58:15.

On June 29, 2022, McCormick signed a confidentiality agreement with Gordon Law. Pl. Ex. 02; Tr. at 60:14 – 64:19. Gordon Law then continued McCormick's at-will employment until McCormick voluntarily resigned in August 2022. Tr. at 81:12-81:24, 522:20-522:25; Pl. Ex. 05.

### D. McCormick Resigned, Confirmed His Confidentiality Obligations, Disclosed the GLG Process to FPSG, and Worked With FPSG to Disclose the GLG Process to the Public.

During his eight-month tenure with Gordon Law from December 2021 to August 2022, McCormick applied for 10 to 200 other jobs. Tr. at 523:12 – 525:24.[2] He eventually obtained a job with FPSG, and on August 16, 2022, McCormick resigned from Gordon Law. Tr. at 81:12-81:24, 522:20-522:25; Pl. Ex. 05. Approximately three weeks later, McCormick began working on crypto tax reconciliation for FPSG. Tr. at 525:5 – 525:12, 526:4 – 527:13.

On McCormick's final day of employment, Gordon Law—consistent with its internal

---

[2] While testifying, McCormick stated that he could not further narrow that range or identify more than two of those potential employers to whom he had applied. *Id.*

policies—conducted an exit interview. Tr. at 81:25 – 82:20. Gordon Law reminded McCormick of his confidentiality obligations and presented him with a certification to acknowledge his compliance with those duties. Reaffirming his confidentiality obligations, McCormick certified (with his signature) that he had not used or disclosed Gordon Law's confidential information. Pl. Ex. 05; Tr. at 70:7 – 71:16.

In or around May 2023—while employed by FPSG to conduct crypto tax reconciliation—McCormick created, and published online for anyone to see, a series of videos describing in detail GLG's Process for crypto tax reconciliation. Tr. at 83:3 – 88:15, 109:14 – 117:1, 118:10 – 127:7; Pl. Exs. 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 23. McCormick also published the source documents used in and demonstrating GLG's Process, including a full set of instructions for how to conduct the GLG Process. *Id.* After commencing his employment with FPSG, McCormick and FPSG had begun using—and continued to use until the TRO—the GLG Process that McCormick had learned while working at Gordon Law. Tr. 528:09-528:15. Prior to hiring McCormick, FPSG had never developed, learned, or used the GLG Process, even though FPSG had spent years conducting crypto tax preparation as one of Gordon Law's competitors. Tr. 468:07-470:17, 471:09-472:08. McCormick disclosed the GLG Process to FPSG, and without that disclosure, FPSG could not and would not have used that process. *See id.* When given the opportunity to explain what he was doing between his last day at Gordon Law and his first day working at FPSG (where he disclosed Gordon Law's intellectual property), McCormick testified that he could not recall. Tr. at 525:5 – 525:12, 526:4 – 527:13.

By disclosing the GLG Process to third parties, McCormick and FPSG undermined Gordon Law's years of costs and efforts to excel in the industry by maximizing the efficiency and accuracy of crypto tax preparation. Tr. at 128:21 – 129:18. Consequently, McCormick and FPSG diminished

Gordon Law's duly-earned, bona fide competitive advantage. *Id.*

As of the hearing, McCormick continues to insist that he will not perform crypto tax reconciliation, with FPSG or otherwise, unless he can utilize part or all of the GLG Process. Tr. at 536:04-536:25, 538:02-538:21. Accordingly, McCormick refuses to agree to any injunctive relief protecting the GLG Process, even if that relief explicitly excludes McCormick and acknowledges that he may continue working on crypto tax reconciliation. *Id.*

## ARGUMENT[3]

A plaintiff must establish four elements to obtain preliminary injunctive relief under Federal Rule of Civil Procedure 65: (1) a substantial likelihood of success on its claims; (2) a threat of irreparable harm; (3) the balance of equities tips in its favor; and (4) injunctive relief will serve the public interest. *Winter v. NRDC, Inc.*, 557 U.S. 7, 20 (2008). Gordon Law addresses each element in turn below.

### A.      Gordon Law Is Substantially Likely to Prevail on Its Claims

"At the threshold stage, a plaintiff moving for preliminary injunctive relief need not show that it 'definitely will win the case.'" *My Fav Elecs., Inc. v. Currie*, No. 24 C 1959, 2024 WL 4528330, at *6 (N.D. Ill. Oct. 18, 2024) (quoting *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020)). "Rather, the movant need only demonstrate that the likelihood exceeds 'a mere possibility of success.'" *Id.* (quoting *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022)); *see also Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021) ("[A] plaintiff must demonstrate that its claim has some likelihood of success on the merits, not merely a better than negligible chance.").

The evidence adduced at the preliminary injunction hearing clears this bar for each of

---

[3] Plaintiff's analysis herein relies on the facts and citations to record evidence as set forth in the "Relevant Facts" section, *supra*. For brevity, Plaintiff has not relisted those citations in the analyses below.

Gordon Law's claims.

**1.    McCormick's Misappropriation of Gordon Law's Trade Secret (Counts I-II).**

To establish misappropriation of a trade secret, Gordon Law "must demonstrate that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner." *Aon Risk Servs. Cos. v. Alliant Ins. Servs*., 415 F. Supp. 3d 843, 848 (N.D. Ill. 2019) (internal quotations and citations omitted). Because the pertinent definitions of the ITSA and the DTSA overlap, courts analyze the likelihood of success of the two claims together. *Id.*; *see also My Fav Elecs., Inc.*, 2024 WL 4528330, at *8 ("The definition of a trade secret under the ITSA and the DTSA is 'materially identical.'" (quoting *Life Spine, Inc.*8 F.4th at 539)). As stated below, the record shows more than a mere possibility of success as to each element.

a.    The GLG Process Is a Trade Secret.

Under ITSA, a trade secret is:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Thermodyne Food Serv. Products, Inc. v. McDonald's Corp*., 940 F. Supp. 1300, 1304 (N.D. Ill. 1996) (quoting 765 ILCS 1065/2(d)). "As evidenced by both of the statutory prongs, whether the information sought to be protected qualifies as a trade secret focuses fundamentally on the *secrecy* of such information." *Id.* The court, moreover, need not examine all documents or information within the trade secret; rather, "a subset, examined [by the court]" can "amply satisf[y] the threshold requirement for likelihood of success on the merits, and allow[ ] the court to fairly weigh

that likelihood at the balancing stage of the preliminary injunction inquiry." *My Fav Elecs., Inc.*, 2024 WL 4528330, at *8.

Critically, "[t]he Seventh Circuit has long held . . . that a trade secret can exist 'in a combination of characteristics and components, each of which, by itself' is not protected, so long as the combination has competitive value." *Id.* (quoting *Life Spine, Inc.*, 8 F.4th at 540–41). Furthermore, "when individual pieces of information are compiled and organized at a single location, the compilation is much more valuable and useful than each piece of information individually, particularly where the compiled form is not easily obtained or accessible to the public." *Id.* (internal quotations omitted); *see also Signal Fin. Holdings LLC v. Looking Glass Fin. LLC*, No. 17 C 8816, 2018 WL 636769, at *4 (N.D. Ill. Jan. 31, 2018) ("A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.").

The GLG Process meets these standards. For at least <u>four</u> reasons, the record shows at least some likelihood of Gordon Law—at trial with a full evidentiary record after a complete discovery period—successfully establishing the existence of a trade secret.

<u>First</u>, the GLG Process includes or consists of the type of information that can be a trade secret. It is a "method" or "process," as well as a compilation with more value and use than offered by any individual component.

<u>Second</u>, Gordon Law has demonstrated the GLG Process's competitive advantage and, in turn, actual or potential economic value. Gordon Law developed the components with substantial research, trial and error, time, money, and innovation—all while the crypto industry chaotically proliferated. Built on that costly foundation, the GLG Process more efficiently yields crypto tax

reports that accurately reflect a client's months or years of disparate crypto transactions spanning unstandardized and unregulated wallets, exchanges, or DeFi sites. Stated differently, the GLG Process benefits clients by accurately accounting for slews of eclectic crypto transactions and doing so in a cost-effective, efficient, and legally supportable manner. The economic value is the reason why Gordon Law uses that process (and has gone to these great lengths to develop and protect it). *See My Fav Elecs., Inc.*, 2024 WL 4528330, at *10 ("If an employer has invested substantial time, money, and effort to obtain a secret advantage, that fact will weigh in favor of finding the existence of a trade secret." (internal quotations omitted)).

Third, Defendants' conduct evidences the GLG Process's actual and potential economic value. McCormick chose to implement the GLG Process at FPSG because he believed the process to be an improvement. McCormick spent hours to create, edit, and publish how-to videos of the GLG Process, because he wanted to advertise his expertise with crypto tax reconciliation. McCormick aimed to publish relevant and valuable content, not to repeat content generally known in the industry.

Similarly, FPSG's conduct confirms that the GLG Process generated economic value for Gordon Law and was not generally known (prior to the misappropriation). Despite being a competitor in crypto tax preparation, with years of experience, FPSG had not developed, discovered, created, or used the GLG Process (until they hired McCormick). In other words, the GLG Process was not generally known to competing crypto tax businesses, like FPSG. Once McCormick disclosed the GLG Process to FPSG, moreover, FPSG promptly adjusted their practices, utilized that process, and profited. Hence, FPSG viewed the GLG Process—as newly disclosed by Gordon Law's former employee—as adding economic value to FPSG's business. If FPSG had already known the GLG Process, FPSG would not have implemented changes after

13

hiring McCormick. If FPSG had viewed its own processes as economically superior to the GLG Process, FPSG would have rejected or ignored the GLG Process and trained McCormick accordingly. Instead, FPSG and McCormick spent months using, branding themselves with, and profiting from the GLG Process that Gordon Law had taught McCormick.

Furthermore, McCormick continues to confirm the GLG Process's economic value. McCormick objected to any injunctive relief that would protect the GLG Process (even if it explicitly carves him out), because he wants to continue crypto tax preparation with that efficient, accurate method. Simply put, McCormick's and FPSG's respective conduct demonstrates the economic value of the GLG Process.

Finally, Gordon Law made reasonable efforts to protect the GLG Process. Gordon Law hired lawyers, like McCormick, who are bound by ethical rules of professional responsibility to maintain confidentiality and refrain from unethical conduct. Gordon Law's employees had individual accounts with two-factor authentication for accessing Gordon Law's Google Drive, where documents were stored. Gordon Law also provided access only to documents relevant to an employee's practice. In other words, some employees lacked access to the documents delineating the GLG Process.

Supplementing those basic protections, Gordon Law imposed a robust confidentiality policy, requiring signed acknowledgment forms. Gordon Law later obtained signed confidentiality agreements from current employees and acknowledgments of confidentiality from departing employees. Because of those protections, Andrew Gordon had not been aware of anyone outside of Gordon Law disclosing the GLG Process—until he saw the hours of videos and linked documents that McCormick published on YouTube while working at FPSG. Gordon Law's collective efforts show that the GLG Process was reasonably well-guarded. *See My Fav Elecs.,*

14

*Inc.*, 2024 WL 4528330, at *10 (noting that "[t]he operative question in this analysis is . . . whether the compilations . . . were reasonably well-guarded" and that "[p]erhaps the most important measure an employer can take to keep its information secret is to impose confidentiality obligations on employees who have access to that information").

        b.    <u>McCormick Misappropriated Gordon Law's Trade Secret.</u>

      "Misappropriation includes the 'disclosure or use of a trade secret' without the consent of the owner by someone who, 'at the time of the disclosure or use, knew or had reason to know' that knowledge of the trade secret was 'acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.'" *Id.* (quoting 765 ILCS 1065/2(b)(2); 18 U.S.C. § 1839(5)). Misappropriation can arise from an employee violating an existing duty, such as a duty of loyalty. *See Hightower Holding, LLC v. Kedi*r, No. 23 CV 15616, 2024 WL 3398361, at *11 (N.D. Ill. July 11, 2024) (holding that an employee could have misappropriated by disclosing her employer's document in violation of her duty of loyalty to the employer).

      Additionally, misappropriation does **not** require disclosure or use of all aspects of the subject trade secret; rather, "'the user of another's trade secret is liable even if he uses it with modifications or improvements upon it effected by his own efforts, so long as the substance of the process used by the actor is derived from the other's secret.'" *PolyOne Corp. v. Lu*, No. 14 CV 10369, 2018 WL 4679577, at *11 (N.D. Ill. Sept. 28, 2018) (quoting *Mangren Research & Dev. Corp. v. Nat'l Chem. Co*., 87 F.3d 937, 944 (7th Cir. 1996)) (acknowledging that "the misappropriation element" would still be met "if defendants' formula were substantially derived from [the plaintiff]'s trade secret but also based on public information or defendants' general experience"). As a policy, "modifications are still protected because if trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that law provides would be hollow indeed."

*Gold Medal Products Co. v. Bell Flavors & Fragrance Inc.*, No. 1:17-CV-4084, 2018 WL 1135629, at *3 (N.D. Ill. Mar. 2, 2018) (citing *Matter of Innovative Const. Sys., Inc*., 793 F.2d 875, 887 (7th Cir. 1986)).

There is no dispute that Defendants disclosed (and used) the GLG Process after McCormick quit his job at Gordon Law and started working for FPSG. McCormick's use of the GLG Process demonstrates the misappropriation. FPSG's use of the GLG Process also demonstrates the misappropriation. Indeed, prior to hiring McCormick, FPSG had its own different processes used by its employees for years, yet upon hiring McCormick, FPSG promptly adopted the GLG Process. Worse yet, McCormick and FPSG did not stop there. They also spent hours creating videos, with links to samples of GLG's internal documents, describing in detail every facet of the GLG Process taught to McCormick while he worked for Gordon Law. And they did so for their own economic benefit, to Gordon Law's detriment.

Consequently, the record surpasses the low threshold for establishing a likelihood of success. Even if the evidence showed only *some* likelihood that *some part* of the GLG Process was disclosed, injunctive relief would be warranted. And the proof easily exceeds that threshold. Defendants brazenly disclosed the entire GLG Process through a series of videos, with links to source documents, describing in detail every step Gordon Law had taught McCormick. Nothing more is required to show some likelihood that Gordon Law will succeed in proving misappropriation at trial.[4]

---

[4] Although one element of the cause of action is whether the misappropriation "damaged" Gordon Law, the requested injunctive relief is available even where the misappropriation has not yet occurred but is merely threatened. *See, e.g.*, *Marquis ProCap Sys. v. Novozymes N. Am., Inc*., No. 20-1020, 2023 WL 4353174, at *6 (C.D. Ill. June 16, 2023) ("Cases in this circuit acknowledge that "[b]oth the DTSA and ITSA permit a court to enjoin actual *or threatened* trade secret misappropriation."). Therefore, it is not clear that the existence of damage is relevant to the likelihood of success factor. Nonetheless, the evidence shows that Gordon Law was damaged by the misappropriation by, at a minimum, losing a competitive advantage earned through years of costly research, trial and error, and innovation. *See* Section B, *infra*.

2.    **McCormick's Breach of the Confidentiality and Intellectual Property Agreement (Count III).**

GLG is likely to prevail on its breach of contract claim against McCormick. McCormick signed the Agreement on June 29, 2022. The Agreement specifically defined "Confidential Information" as including "workpapers, templates for reconciling cryptocurrency transactions to generate tax reports, training videos, documents, manuals, . . . documentation on best practices, usage tips for software, and all information regarding the highly efficient process for crypto tax reporting that was developed by [GLG]" ("Confidential Information"). The Agreement further provided that McCormick "may not and shall not copy, disclose or use, at any time, either during or after the term of employment, any Confidential Information for any reason," except in furtherance of his GLG duties.

As detailed above regarding McCormick's misappropriation of Gordon Law's trade secret, McCormick breached the Agreement in several ways, including by: (a) using GLG's Confidential Information for his own, and FPSG's, benefit; (b) failing to keep GLG's Confidential Information secret and confidential; (c) disclosing GLG's Confidential Information to Founder's management and employees; and (d) publishing the Training Materials on Founder's publicly available YouTube page.

The Defendants do not, and credibly cannot, contest that (1) the GLG Process constitutes Confidential Information under the Agreement, or (2) McCormick breached the Agreement by using and publicly disclosing the Confidential Information after his resignation from Gordon Law. Rather, McCormick is forced to argue only that the Agreement is unenforceable because (1) Gordon Law failed to provide consideration to enforce the Agreement, and (2) the restrictive covenant is unreasonably in scope. Both arguments are meritless.

First, the very first sentence of the Agreement plainly provides that McCormick agrees to

the terms set forth therein "in consideration of [Gordon Law] providing . . . continued at-will employment." Illinois courts have routinely held that continued at-will employment can constitute adequate consideration for employment agreements such as the one at issue here. *See, e.g.*, *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 715-17 (N.D. Ill. 2014) (collecting cases). Second, the restrictive covenant is reasonable in its scope. The Agreement is narrowly tailored to protect only Confidential Information and trade secrets, and specifically relates to the very information, processes, procedures, templates, formulas and scripts at issue here. Illinois courts routinely uphold non-disclosure covenants that are limited to confidential and trade secret information that an employer maintains. *See, e.g.*, *Coady v. Harpo, Inc.*, 719 N.E.2d 244, 250-51 (Ill. App. Ct. 1999); *A.B. Dick & Co. v. Am. Pro-Tech*, 514 N.E.2d 45, 49 (Ill. App. Ct. 1987).

McCormick unquestionably breached the Agreement by using and disclosing Gordon Law's Confidential Information after his resignation, and the Agreement is enforceable. Accordingly, there is at least "some likelihood" that Gordon Law will prevail in its breach of contract claim against McCormick, and injunctive relief is appropriate. *See Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021).

### B.     Gordon Law Will Suffer Irreparable Harm Absent Injunctive Relief.

Harm is "irreparable" if courts cannot prevent it or fully remedy it by a final judgment after trial. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1089 (7th Cir. 2008). Gordon Law has no adequate remedy at law and will suffer irreparable harm without injunctive relief. The very use of confidential information or trade secrets constitutes irreparable harm. *See IDS Fin. Servs. v. Smithson*, 843 F. Supp. 415, 418–19 (N.D. Ill. 1994) ("[T]he threat is significant that the harm experience[d] by the misappropriation or misuse of trade secrets will be irreparable . . . . Additionally, once the trade secrets are disclosed they will no longer be confidential and their value to IDS will be decreased."). In fact, courts often presume

"irreparable harm to the plaintiff in cases of trade secret misappropriation." *See, e.g., Computer Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 700 (N.D. Ill. 2004).

Here, Gordon Law's remedy at law is inadequate because Defendants have used, and inevitably will continue to use, its Confidential Information and trade secrets in direct competition with Gordon Law. Once confidential information and trade secrets are misappropriated, there is no way to make it confidential and secret again. The harm suffered by Gordon Law as a result of the misappropriation of its Confidential Information and trade secrets—including but not limited to lost profits, lost customer relationships, lost market share, and reputational damage—cannot be calculated with any reasonable degree of certainty. *See Life Spine*, 8 F.4th at 545–46 (finding irreparable harm because of difficulty in quantifying lost customers, market share, and reputation harm); *see also Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) ("[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'"). Gordon Law is entitled to protect its Confidential Information and trade secrets through injunctive relief.

**C.** **Balance of Hardships and Public Interest Favor Entry of a Preliminary Injunction.**

Under the sliding-scale approach, the balance-of-hardships analysis strongly leans in Gordon Law's favor. *See Ty, Inc. v. The Jones Grp*., 237 F.3d 891, 895 (7th Cir. 2001) ("[T]he more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position."). Here, Defendants have no legitimate right to unlawfully compete with Gordon Law through misappropriation of its Confidential Information and trade secrets. Accordingly, Defendants will suffer no harm to any legitimate interest through entry of a preliminary injunction. *See, e.g., Arcadia Health Servs., Inc. v. A+ Health Care, Inc*., No. 96 C 8363, 1997 U.S. Dist. LEXIS 705, at *14 (N.D. Ill. Jan. 17, 1997) (finding no harm to former

employee by forcing her to comply with the terms of her contract with plaintiff).

Conversely, Gordon Law will suffer significant, irreparable harm if the Court does not grant injunctive relief. Gordon Law will lose competitive position and control over its Confidential Information and trade secrets. Once control over this information is lost, Gordon Law can never get it back, and can never again fairly compete in the marketplace.

## **<u>CONCLUSION</u>**

For these reasons, Plaintiff respectfully request that the Court enter a Preliminary Injunction prohibiting the Defendants from using or disclosing to any other person or entity the GLG Process, as defined above.


Dated: December 6, 2024

*/s/ Constantine P. Economides*
Constantine P. Economides
Michael B. Homer
Eric Rosen
**DYNAMIS LLP**
1111 Brickell Ave.
10th Fl.
Miami, FL 33131
ceconomides@dynamisllp.com

*Counsel for Plaintiff The Gordon Law Group, Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 6, 2024, I electronically filed this motion with the Clerk of the Court for the United States Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that that service will be accomplished by the CM/ECF system.

/s/ *Constantine P. Economides*